John Wesley CLUTCHETTE,
Plaintiff-Appellant,

v.

Ruth RUSHEN, Defendant-Appellee.

No. 84–2636.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 10, 1985.

Decided Sept. 11, 1985.

Albert W. Brodie, Sacramento, Cal., for plaintiff-appellant.

Willard Jones, William George Prahl, Deputy Attys. Gen., Sacramento, Cal., for defendant-appellee.

Before SNEED and BEEZER, Circuit Judges, and TAKASUGI *, District Judge.

SNEED, Circuit Judge:

The appellant, John Wesley Clutchette, was convicted in state court of first degree murder on the basis of evidence that his wife obtained and then turned in to the police while she worked as an investigator for Clutchette's defense counsel. Clutchette appeals from the denial of his habeas corpus petition. He asserts that he was deprived of the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments. He also asserts that the district court erred by granting the appellee more time to answer his petition than the period provided by Fed.R.Civ.P. 81(a)(2). We affirm.

## I.

### FACTS AND PROCEEDINGS BELOW

On July 10, 1978, the victim, Bob Bowles, was killed. The Sacramento police discovered the body the next day in a parking lot. Bowles had been shot twice in the head.

In the course of investigating the shooting, the police uncovered an eyewitness, Dawn Poulson. Poulson told the police that on July 10 she had driven from Oakland to Sacramento with Clutchette and Bowles in Clutchette's 1976 Lincoln Continental. They stopped at a parking lot. The two men left the car for a short time and then returned. Clutchette sat in the back seat, and Bowles sat in the front passenger seat. There was a shot, and Bowles slumped over on the front seat. Clutchette then removed Bowles from the car and, according to Poulson, shot Bowles a second time. Clutchette and Poulson left the body in the parking lot and returned to Oakland. Upon arrival, Clutchette, helped by a friend, Worthington Alston, tried to wipe Bowles's blood from the car seats.

Notwithstanding Poulson's account of the killing, charges against Clutchette were dismissed in December of 1978 for lack of evidence. In April, 1979, however, new evidence came to light.

At that time, Clutchette's wife contacted the Oakland and Sacramento Police Departments. She informed the police that she had served as an investigator for her husband's defense counsel. In the course of her service, she continued, the attorney had sent her to retrieve certain receipts from an individual in Los Angeles. She believed that these receipts would serve as evidence in the case against her husband. After this conversation, Mrs. Clutchette turned the receipts over to the police.

The receipts were from an automobile upholstery shop where Clutchette had brought his car for reupholstering. The police visited the store and picked up leather seat covers which the store owner identified as those removed from Clutchette's 1976 Lincoln. With the help of a forensic serologist, the police determined that the seat covers bore tiny but tell-tale bloodstains matching the victim's blood type. Armed with the receipts and the seat covers, the state refiled murder charges against Clutchette on June 5, 1980.

The receipts provided the cornerstone of the prosecution's case against Clutchette. Although the trial judge, relying on the attorney-client privilege, suppressed all communications about the case which Mrs. Clutchette disclosed to the police, he allowed the introduction of the receipts themselves at trial. Following a jury trial, Clutchette was convicted as charged.

After Clutchette exhausted his appeals in state court, he petitioned the federal district court under 28 U.S.C. § 2254 (1982) for a writ of habeas corpus, alleging violations of the Sixth and Fourteenth Amendments. On November 15, 1982, the district

* Honorable Robert M. Takasugi, United States District Judge for the Central District of California, sitting by designation.

court ordered the Director of the California Department of Corrections (the state) to show cause within 30 days why Clutchette's petition should not be granted. On December 28, the state requested an extension of time in which to answer Clutchette's petition. Clutchette then moved the district court to deem the allegations in the petition admitted and to render a decision based on the state court record without considering the state's response. The district court granted the state's request and denied Clutchette's motion. The state filed its answer, which it had lodged with the district court on January 5, 1983, on January 12.

Acting on Clutchette's request, the district court certified the question whether it could consider the state's late-filed answer for interlocutory appeal under 28 U.S.C. § 1292(b) (1982). Expressing no view on the merits, the Ninth Circuit denied Clutchette permission to appeal. On August 13, 1984, the district court denied Clutchette's petition. Clutchette timely appealed.

## II.

## THE RIGHT TO COUNSEL

Clutchette maintains that, by accepting the receipts from his wife, the police invaded his confidential relationship with his attorney and thereby denied him the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments. The district court rejected this contention. Finding that, under California law, the attorney-client privilege does not cover physical evidence, the court concluded that the government had not intruded into a privileged area and therefore had not violated Clutchette's constitutional rights. Clutchette concedes that the receipts themselves are not privileged, but argues that the *manner* in which the police obtained them violated the Sixth Amendment.

■ Standing alone, the attorney-client privilege is merely a rule of evidence; it has not yet been held a constitutional right. *See Maness v. Meyers,* 419 U.S. 449, 466 n. 15, 95 S.Ct. 584, 595 n. 15, 42 L.Ed.2d 574

(1975); *Beckler v. Superior Court,* 568 F.2d 661, 662 (9th Cir.1978). In some situations, however, government interference with the confidential relationship between a defendant and his counsel may implicate Sixth Amendment rights. *See, e.g., Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). Such an intrusion violates the Sixth Amendment only when it substantially prejudices the defendant. *United States v. Irwin,* 612 F.2d 1182, 1186–87 (9th Cir.1980); *see United States v. Glover,* 596 F.2d 857, 863–64 (9th Cir.), *cert. denied,* 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979).

■ The Supreme Court's decision in *Weatherford v. Bursey* governs Clutchette's case. There, an undercover government agent attended meetings between a criminal defendant and his attorney. The Supreme Court found no denial of the right to counsel. The Court carefully pointed out that the government had not deliberately invaded the defense camp. *See Weatherford,* 429 U.S. at 557, 97 S.Ct. at 844. The agent, who was posing as a codefendant, attended the meetings only at the defendant's invitation. His purpose in attending, and the state's purpose in allowing his attendance, was to protect his undercover status, not to learn about the defendant's defense plans or to intrude on the lawyer-client relationship. *Id.* at 547–48, 557, 97 S.Ct. at 839–40, 844. Moreover, the agent's presence had not prejudiced the defendant by providing any information to be used against him at trial:

> Had Weatherford testified at Bursey's trial as to the conversation between Bursey and [his lawyer]; had any of the State's evidence originated in these conversations; had those overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford, an undercover agent, the details of the ... conversations about trial preparations, Bursey would have a much stronger case.

*Id.* at 554, 97 S.Ct. at 843 (footnote omitted).

It is no different here. The state did not deliberately intrude into Clutchette's privileged relationship with his attorney. In all of the cases Clutchette cites, the government actively infiltrated the defense, either by planting informants or by intercepting confidential communications or by other means. *See, e.g., Caldwell v. United States,* 205 F.2d 879 (D.C.Cir.1953) (information obtained by government agent posing as a defense assistant); *Coplon v. United States,* 191 F.2d 749 (D.C.Cir.1951) (government interception of telephone messages between the defendant and her attorney), *cert. denied,* 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 690 (1952). Here, by contrast, the government's role was entirely passive: the police neither initiated the contact with Mrs. Clutchette nor encouraged her to turn over the receipts. She betrayed her husband voluntarily, and *her* actions, not the misconduct of government agents, caused the alleged breach in Clutchette's attorney-client relationship.

Nor was Clutchette "substantially prejudiced" by the conduct of which he complains. He does not assert that Mrs. Clutchette divulged privileged communications concerning defense strategy to the authorities. Indeed, any confidences she revealed pertained exclusively to the significance of the receipts themselves. In addition, the trial court scrupulously disallowed the disclosure at trial of Mrs. Clutchette's role in her husband's defense and the source of the information leading to the discovery of the receipts. Thus, any prejudice that Clutchette suffered must have stemmed from the state's use of the receipts—and the seat covers—as evidence at trial. *See Weatherford,* 429 U.S. at 552, 554, 97 S.Ct. 842, 843; *Irwin,* 612 F.2d at 1186–87.

We recognize that the introduction of evidence obtained either directly or indirectly through interference with the attorney-client relationship is a paradigm example of the kind of prejudice that warrants finding a denial of the right to counsel. *See, e.g., Irwin,* 612 F.2d at 1186–87; *see also United States v. Shapiro,* 669 F.2d 593, 598 (9th Cir.1982); *United States v. Bagley,* 641 F.2d 1235, 1238–39 (9th Cir.), *cert. denied,* 454 U.S. 942, 102 S.Ct. 480, 70 L.Ed.2d 251 (1981). That is not this case, however. Clutchette's defense attorney faced a separate duty under state law to surrender the receipts to the prosecution.

 It is true, presumably, that Clutchette told his attorney where to find the receipts and that the attorney relayed that communication to Mrs. Clutchette. No doubt these communications were privileged. The receipts themselves, however, were not, once the defense attorney removed them from their original location. California law requires that a defense attorney must, after a reasonable time, turn evidence taken from its original resting place over to the prosecution. *See People v. Lee,* 3 Cal.App.3d 514, 526, 83 Cal.Rptr. 715, 722 (1970); *see also People v. Meredith,* 29 Cal.3d 682, 631 P.2d 46, 175 Cal. Rptr. 612 (1981) (when defense counsel removes or alters evidence discovered through a privileged communication, the attorney-client privilege does not bar revelation of the evidence's original location or condition). Had the attorney left the receipts in their original location, he could have claimed the privilege and refused to disclose Clutchette's communication to the authorities. Instead, he dispatched Mrs. Clutchette, his agent, to retrieve them. Once the receipts were in his constructive possession, Clutchette's attorney was obligated to give them to the state. The state's acquisition of the receipts directly from Mrs. Clutchette therefore did not prejudice the defense.[1]

---

1. Relying on the inevitable discovery exception to the exclusionary rule recently acknowledged by the Supreme Court, *see Nix v. Williams,* —— U.S. ——, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), Clutchette argues that a defense attorney's duty to surrender evidence to the prosecution should hinge on a showing by the prosecution that it would have inevitably discovered the evidence in its original location. *See* Comment, *People v. Meredith: The Attorney-Client Privilege and the Defendant's Constitutional Rights,* 70 Calif.L. Rev. 1048, 1064–68 (1982). In *Nix,* police officers discovered the location of the victim's body by interrogating the defendant in violation of

Clutchette responds by challenging the constitutionality of the rule espoused in *Meredith* and *Lee*. He asserts that the rule forces an accused to choose between his Fifth and Sixth Amendment rights. *Cf. Simmons v. United States*, 390 U.S. 377, 389–94, 88 S.Ct. 967, 973–76, 19 L.Ed.2d 1247 (1968) (where a defendant testifies in support of a motion to suppress evidence assertedly seized in violation of the Fourth Amendment, the subsequent admission of that testimony against the defendant at trial creates an intolerable tension between constitutional rights). The defendant must elect either complete disclosure to his attorney, to facilitate planning an effective defense, or only partial disclosure, to avoid incriminating himself by divulging the location of key evidence which the attorney must then disclose to the prosecution. We reject this contention because Clutchette faced no such dilemma.[2]

On their face, the receipts revealed that Clutchette had reupholstered his 1976 Lincoln in late July, 1978, and disclosed the name and location of the upholstery shop. Taking possession of the receipts was unnecessary to understanding their significance. Had Clutchette's attorney simply left the receipts in their original location and condition, he still would have fully discharged the obligation implied by Clutchette's right to counsel. In that situation, the attorney-client privilege would have shielded Clutchette's disclosure. Indeed, his removal of the evidence from its original location suggests an attempt to frustrate the prosecution's efforts to find it.[3] The Sixth Amendment plainly does not countenance the inclusion of such actions within the scope of "effective assistance of counsel."

Clutchette, therefore, has failed to establish a deprivation of rights protected by the Sixth Amendment.

## III.

### THE TIME IN WHICH THE STATE MUST ANSWER

Rule 81(a)(2) of the Federal Rules of Civil Procedure requires that a writ of habeas corpus "shall be returned within 3 days unless for good cause shown additional time is allowed which in cases brought under 28 U.S.C. § 2254 shall not exceed 40 days." The Rule embodies a 1971 amendment lengthening the response period pro-

---

his Sixth Amendment right to counsel. The Court upheld the admission of evidence of the body's location and condition at trial, finding that where "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... the evidence should be received." 104 S.Ct. at 2509. The district court's reliance on his attorney's state-law obligation to turn in the receipts, Clutchette maintains, short-circuited the requirement of *Nix* that the prosecution must establish by a preponderance of the evidence that the government's discovery of the receipts in their original location was inevitable. We disagree.

Clutchette's argument assumes the answer to the question raised by his appeal. Our task is not to decide whether a particular constitutional violation warrants applying the exlusionary rule but rather to decide whether the government's conduct in this case denied Clutchette's right to counsel. Moreover, in answering the question presented, we reject Clutchette's implicit contention that the right to counsel embraces the right to sequester critical evidence in the possession of one's attorney, subject only to the prosecution's opportunity to establish that it would have discovered the evidence by its own efforts. We decline to adopt a rule that "might encourage defense counsel to race the police to seize critical evidence." *Meredith*, 29 Cal.3d at 694, 631 P.2d at 53, 175 Cal.Rptr. at 619 (discussing state attorney-client privilege).

**2.** Even assuming the *Meredith* rule implicates the self-incrimination privilege, the constitutional dilemma suggested by Clutchette would exist, if at all, only in situations where the defense attorney cannot gauge the import of the evidence revealed by his client—and therefore cannot provide effective assistance in preparing the defense—without actually taking possession of it. Thus, for example, the need to conduct a ballistics or fingerprint test may require removing the evidence from its original resting place. *See Meredith*, 29 Cal.3d at 693 n. 7, 631 P.2d at 53 n. 7, 175 Cal.Rptr. at 619 n. 7. In Clutchette's case, however, no such need existed.

**3.** There is some indication in the record that Clutchette's attorney intended to destroy the receipts. Such conduct oversteps the boundary between effective assistance and unethical—or, indeed, illegal—behavior.

vided by 28 U.S.C. § 2243 (1982) from 20 to 40 days.

The district court allowed the state more time than the 43 days provided in the Rule. Relying on the advisory committee note explaining the 1971 amendment, Clutchette argues that the 40-day period for extensions is mandatory and that the district court lacked the power to grant more time to respond.[4] *See United States ex rel. Mattox v. Scott,* 507 F.2d 919, 923 (7th Cir.1974). We disagree.

In a similar situation, this court has said that the district court possesses "inherent power" to grant the state additional time to file a return. *See Wallace v. Heinze,* 351 F.2d 39, 40 (9th Cir.1965), *cert. denied,* 384 U.S. 954, 86 S.Ct. 1574, 16 L.Ed.2d 550 (1966). In *Wallace,* a state prisoner, appealing the dismissal of his habeas petition, asserted that the district court had not complied with the requirement of 28 U.S.C. § 2243 that the government respond within 3 days unless, for good cause shown, granted an additional period, not to exceed 20 days, to respond. Although *Wallace* suggests we resolve this question in favor of the state, the opinion fails to address the precise issue before us. It is unclear whether the court addressed the propriety of an extension beyond 3 days or beyond 20 days. *E.g., Troglin v. Clanon,* 378 F.Supp. 273, 276 & n. 12 (N.D.Cal.1974). Moreover, the court's decision antedates the 1971 amendment to Rule 81(a)(2) and its advisory committee note. *Wallace,* therefore, does not entirely refute Clutchette's argument.

Whatever the shortcomings of *Wallace,* however, Clutchette's argument must be tested against the passage by Congress of Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts.

*See* Pub.L. No. 94–426, § 1, 90 Stat. 1334, 1334 (1976). Rule 4 provides that, unless the district judge summarily dismisses the petition, "the judge shall order the respondent to file an answer or other pleading *within the period of time fixed by the court....*" (emphasis added). Clutchette concedes that the rule specifies no fixed time period in which the state must answer a petition, but relying on the advisory committee note, he argues that Congress merely intended to relax the requirement of Fed.R.Civ.P. 81(a)(2) that the district court should grant extensions only for good cause shown. Rule 4 does not, he concludes, vary the time limit specified in Rule 81(a)(2).

The advisory committee note does not support Clutchette's assertion. The committee's explanation indicates that it intended to change not just the good cause requirement of Rule 81(a)(2) but the 40-day time limit as well:

In the event an answer is ordered under rule 4, *the court is accorded greater flexibility than under § 2243 in determining within what time period an answer must be made.* Under § 2243, the respondent must make a return within three days after being so ordered, with additional time of up to forty days allowed under ... Rule 81(a)(2), for good cause. In view of the widespread state of work overload in prosecutors' offices ..., additional time is granted in some jurisdictions as a matter of course. Rule 4, *which contains no fixed time requirement,* gives the court the discretion to take into account various factors such as the respondent's workload and the availability of transcripts before determining a time within which an answer must be made.

Fed.R.Civ.P. 81(a)(2) advisory committee note (1971 amendment). Clutchette maintains that, in extending the response period, the committee fully considered the burden that responding to habeas petitions places on state prosecutors. The committee did not intend, Clutchette concludes, district courts to extend the response period further.

---

**4.** In lengthening the period in which the state may respond, the drafters explained that

The substantial increase in the number of such proceedings in recent years has placed a considerable burden on state authorities. Twenty days has proved in practice too short a time in which to prepare and file the return in many such cases. Allowance of additional time should, of course, be granted only for good cause.

Rule 4 advisory committee note (emphasis added and citation omitted). This leaves no doubt that the district court had discretion to grant the state an extension that exceeded the 40-day limit of Rule 81(a)(2). The district court did not abuse its discretion in doing so.

AFFIRMED.