Robert WEMARK, Appellant,

v.

STATE of Iowa, Appellee.

No. 98–586.

Supreme Court of Iowa.

Nov. 17, 1999.

Alfredo Parrish of Parrish, Kruidenier, Moss, Dunn & Montgomery, L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich, Assistant Attorney General, and Andrew Van Der Maaten, County Attorney, for appellee.

Considered by McGiverin, C.J., and Larson, Carter, Cady, and Andreasen,* JJ.

CADY, Justice.

Robert Wemark appeals from a ruling by the district court denying his application for postconviction relief based upon ineffective assistance of counsel. We affirm.

## I. Background Facts and Proceedings.

Robert Wemark was found guilty of first-degree murder on August 18, 1993 following a jury trial. The victim was his wife, Melissa Wemark. She was stabbed fifteen times with a knife. Wemark was sentenced by the district court to life imprisonment. The judgment and sentence were affirmed on appeal.

On August 8, 1996, Wemark filed an application for postconviction relief. He claimed his trial attorneys were ineffective for instructing him to meet prior to trial with a medical expert retained by the State and encouraging him to disclose to the expert the location of the knife used to kill his wife. He also claimed his trial counsel were ineffective for failing to investigate potential outside influences on the jury he believed occurred during the course of the trial, and failing to properly challenge certain testimony presented by the State medical examiner.

Wemark was represented at his trial by two experienced criminal defense lawyers. Prior to trial, the two lawyers filed a notice of intent to rely upon the defense of diminished responsibility. They were confronted with an abundance of evidence gathered by law enforcement which pointed to Wemark as the perpetrator of the crime. His wife had been found dead in his home with stab wounds to her neck, chest, and back. The crime scene had been cleaned, and certain clothing had been washed. However, law enforcement authorities followed a trail of bloody clothing to an abandoned farm house where Wemark was found in a fetal position with two self-inflicted gunshot wounds. Wemark initially told authorities his wife had fallen on a knife, but he later admitted to stabbing her. There was also evidence Wemark was upset about the estrangement from his wife and

---

* Senior judge assigned by order pursuant to Iowa Code section 602.9206 (1999).

had made a statement in the past inferring an intent to end the marriage with a murder-suicide. Wemark gave conflicting accounts to authorities about the location of the rifle he used to shoot himself. Investigators eventually discovered the rifle with Wemark's help, but were unable to find the knife during the months following the incident despite a prolonged search of the home.

Defense counsel employed a medical expert prior to trial to conduct a psychiatric examination of Wemark in an effort to obtain evidence to support the defense of diminished capacity. The expert examined Wemark and reported to defense counsel that he was unable to substantiate the defense.

Wemark was also scheduled to be examined by Dr. Michael Taylor, a medical expert employed by the State after Wemark filed his diminished responsibility defense. Before the scheduled interview, Wemark disclosed the location of the knife he used to stab his wife to his counsel. He had placed the knife in a pile of automotive parts under the basement steps of the house, which law enforcement authorities failed to detect during their extensive search of the home.

Defense counsel were immediately concerned they had an ethical obligation to disclose the location of the knife to the prosecution. They considered nondisclosure to be the same as concealment and an interference with police investigation. They solicited general opinions based upon hypothetical facts from a judge and three experienced lawyers, who all confirmed the presence of an ethical dilemma. However, some of the opinions may have been premised on the assumption that the knife was in the possession of defense counsel. Nevertheless, defense counsel concluded they had three options to pursue once Wemark informed them of the location of the knife. The first option was to wait for the State to search the house again and find the knife. Yet, defense counsel believed it was unlikely law enforcement would search the

home a second time. The second option was to have Wemark inform Dr. Taylor of the location of the knife during the scheduled interview. Defense counsel knew Dr. Taylor would then notify the prosecutor. The third option was to engage the services of an attorney to relay the location of the knife to the prosecutor without disclosing the source of the information.

Defense counsel believed the second option could be used to Wemark's benefit. They felt voluntary disclosure could be used at trial to bolster Wemark's credibility and show the ineptitude of the police investigation. Additionally, defense counsel felt it was beneficial to Wemark to keep his scheduled appointment with Dr. Taylor despite the findings of their own expert witness. They hoped Dr. Taylor might bolster the defense of diminished responsibility.

Defense counsel informed Wemark of the ethical dilemma and the three options. They urged him to keep the appointment with Dr. Taylor and to disclose the location of the knife during the course of the examination.

Wemark was subsequently interviewed by Dr. Taylor. He informed Dr. Taylor of the location of the knife. Dr. Taylor then relayed the information to the prosecutor and the knife was removed in a second search of the home. The knife was introduced into evidence at trial and displayed by the prosecutor in closing argument. The State also conducted forensic tests on the knife prior to trial and was unable to find any fingerprints but did find traces of blood consistent with characteristics of Melissa's blood. This evidence was introduced at trial, as well as the location of the knife. Wemark claims the location of the knife should not have been disclosed, and the ability of the State to introduce it into evidence at trial prejudiced his defense.

The second claim of ineffective assistance of counsel raised by Wemark focused on his belief that the jury verdict was influenced by outside forces which he as-

serts his counsel failed to adequately investigate. The trial was closely followed by the media and various members of the community, including persons associated with the local domestic abuse shelter. There was extensive news coverage of the trial, and on one occasion several people appeared at trial wearing purple ribbons. There was also a claim that a juror indicated there "would be a riot" if Wemark was not convicted.

The third claim by Wemark was his defense counsel was ineffective in failing to adequately challenge the testimony of the State medical examiner concerning the nature of the stab wounds. Dr. Thomas Bennett testified some of the stab wounds were six inches deep. The blade of the knife, however, was three and one-half inches in length. Dr. Bennett explained fatty tissue can compress making the depth of the wound longer than the blade of the knife. Defense counsel did not refute this testimony, or challenge it by obtaining an independent medical expert.

The district court denied the application for postconviction relief. It found defense counsel exercised reasonable trial strategy by allowing Wemark to meet with Dr. Taylor and by encouraging him to disclose the location of the knife. It also found the admission of the knife into evidence at trial did not result in prejudice to Wemark. The district court further found there was no credible evidence of jury misconduct, and the outcome of the trial was not altered by the testimony of Dr. Bennett.

Wemark appeals. He asserts each claim of ineffective assistance of counsel was established by the evidence. Additionally, he claims, if insufficient individually, the cumulative effect of the errors was so prejudicial that it denied him a fair and impartial trial, as well as effective assistance of counsel.

## II. Scope of Review.

Generally, an appeal from the denial of an application for postconviction relief is reviewed for errors of law.

*Fenske v. State*, 592 N.W.2d 333, 338 (Iowa 1999). However, if the applicant raises constitutional issues, we review "in light of the totality of the circumstances and the record upon which the postconviction court's ruling was made." *Harpster v. State*, 569 N.W.2d 594, 596 (Iowa 1997) (quoting *Giles v. State*, 511 N.W.2d 622, 627 (Iowa 1994)). This "totality of the circumstances" scope of review is equivalent to a de novo review. *Key v. State*, 577 N.W.2d 637, 639 (Iowa 1998). Wemark alleges the denial of his right to effective assistance of counsel violated his Sixth and Fourteenth Amendment rights, as well as resulted in a denial of his right to a fair trial. As these are constitutional matters, our review is de novo.

## III. Ineffective Assistance of Counsel Claims.

To establish an ineffective assistance of counsel claim, the applicant must show that "(1) counsel failed to perform an essential duty, and (2) prejudice resulted therefrom." *State v. Miles*, 344 N.W.2d 231, 233–34 (Iowa 1984). The test of ineffective assistance of counsel focuses on whether the performance by counsel was reasonably effective. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). The applicant must show the performance fell below an objective standard of reasonableness so that counsel failed to function as guaranteed by the Sixth Amendment. *Id.*

There is a strong presumption that the performance of counsel falls within the wide range of reasonable professional assistance. *See State v. Hepperle*, 530 N.W.2d 735, 739 (Iowa 1995) (citing *Strickland*, 466 U.S. at 689–90, 104 S.Ct. at 2065–66, 80 L.Ed.2d at 693–94). Improvident trial strategy or miscalculated tactics do not necessarily constitute ineffective assistance of counsel. *State v. Aldape*, 307 N.W.2d 32, 42 (Iowa 1981). There must be an affirmative factual basis establishing inadequate representation. *Id.*

■ The first prong of the two-part test of ineffective assistance of counsel is satisfied if the applicant establishes a breach of an essential duty. *State v. Risdal,* 404 N.W.2d 130, 131 (Iowa 1987). The second prong of the test is satisfied if a reasonable probability exists ˙that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. Hildebrant,* 405 N.W.2d 839, 841 (Iowa 1987).

## A. Disclosure of Location of Instrumentality of the Crime.

The decision by defense counsel to disclose the location of the knife implicates a legal principle deeply rooted in history. The concept that communications between a lawyer and client are absolutely privileged from disclosure is the oldest of all privileges involving confidential communications and has been firmly entrenched in English law since the reign of Elizabeth I over 400 years ago. 8 John H. Wigmore, *Evidence* § 2290, at 542 (McNaughton rev. 1961); *see also The Attorney–Client Privilege: Fixed Rules, Bargaining & Constitutional Entitlement,* 91 Harv. L.Rev. 464 (1977). It developed not long after the very concept of presenting testimony by witnesses at trial grew into favor. 8 John H. Wigmore, *Evidence* § 2290, at 542. Some legal scholars even suggest the roots of the privilege extend to Roman times, as a product of the ancient concept that a slave was incompetent to bear witness against his master and the idea that a roman advocate was incompetent to testify against his client. Max Radin, *The Privilege of Confidential Communications Between Lawyer & Client,* 16 Cal. L.Rev. 487, 487–88 (1928). Regardless of its source, the attorney-client privilege has always been a foundational part of our own American system of justice. It was a part of the original codification of our Iowa laws, as well as our own common law. *See* Iowa Code § 2393 (1851); *Squealer Feeds v. Pickering,* 530 N.W.2d 678, 684 (Iowa 1995).

The privilege originated to assure the sanctity of the oath and honor of an attorney. It evolved, however, over time to satisfy the utilitarian need of encouraging unrestrained communication by clients so they, without fear of betrayal, may conduct their affairs through the hands of their learned attorneys. *The Lawyer–Client Privilege,* 56 Nw. U.L.Rev. 235, 235 (1961).

By the last quarter of the 18th Century, this rationale (unrestrained communication) became the exclusive justification for the preservation of confidentiality, although, to be sure, the earlier underpinnings remain, particularly where the attorney's obligation rests on the ethical duty as opposed to the privilege against compelled disclosure.

*People v. Fentress,* 103 Misc.2d 179, 425 N.Y.S.2d 485, 491 (1980).

This utilitarian justification for the privilege rests today on three major propositions. 1 McCormick on Evidence § 87, at 314 (4th ed.1992) (hereinafter "McCormick"). First, the law is complex and pervasive in today's society and lawyers are needed to help others manage their affairs and resolve disputes. *Id.* Second, lawyers need full knowledge of all of the facts to properly discharge this important function. *Id.* Third, a client would be reluctant to reveal all of the facts to a lawyer without assurance that the lawyer will not reveal those confidences. *Id.*

■ In the context of a criminal case, these three propositions take on special significance. *See People v. Meredith,* 29 Cal.3d 682, 175 Cal.Rptr. 612, 631 P.2d 46, 51 (1981). While the attorney-client privilege is not derived from the constitution, violation of the privilege may implicate the Sixth Amendment right to counsel. *Clutchette v. Rushen,* 770 F.2d 1469, 1471 (9th Cir.1985); *see also Maness v. Meyers,* 419 U.S. 449, 466 n. 15, 95 S.Ct. 584, 595 n. 15, 42 L.Ed.2d 574, 588 n. 15 (1975); *State v. Coburn,* 315 N.W.2d 742, 748 (Iowa 1982) (attorney-client privilege impacts right to counsel). Adequate legal representation can depend upon the full disclo-

sure of the facts by the client to counsel. *Meredith,* 175 Cal.Rptr. 612, 631 P.2d at 51 (citing *City & County of San Francisco v. Superior Ct.,* 37 Cal.2d 227, 231 P.2d 26, 30 (1951)). Thus, if a criminal defendant is to receive the full benefits of the right to counsel, the confidence and privacy of communications with counsel must be assured. *Id.* (citing *Barber v. Municipal Ct.,* 24 Cal.3d 742, 157 Cal.Rptr. 658, 598 P.2d 818, 822 (1979)); *see also Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39, 51 (1976); McCormick § 87, at 314.

■ Although a strong tradition of loyalty exists between a lawyer and client, a lawyer is also an officer of the court who is bound by a code of professional conduct. The legal privilege of confidentiality between a lawyer and client is, therefore, intricately related to our Code of Professional Responsibility. McCormick § 87, at 317.

■ Under our rules of professional responsibility, a lawyer is not, except under special circumstances, permitted to reveal confidential information of a client and may not use it to the disadvantage of the client. Iowa Code of Prof'l Responsibility DR 4–101. A lawyer may reveal the confidence of a client only when consent is given by the client, when permitted under disciplinary rules or the law, when the intention of the client is to commit a crime and the information is necessary to prevent the crime, or when necessary to collect a fee or provide a defense against an accusation of wrongful conduct. *Id.* On the other hand, a lawyer is not permitted to suppress evidence the law requires to be revealed or produced. *See id.* DR 7–109. Furthermore, a lawyer may not "conceal or knowingly fail to disclose" matters in the representation of a client which are required by law to be revealed. *See id.* DR 7–102(A)(3). Thus, the ethical prescriptions essentially rely upon the legal principles to guide the requirements of a lawyer to disclose matters otherwise protected within the attorney-client privilege.

Nevertheless, the legal responsibility imposed upon lawyers who learn of the existence of tangible evidence of a completed crime in the course of an attorney-client relationship is complex and far from settled. Moreover, a lawyer can be faced with a host of conflicting important obligations to balance, including the duty to preserve client confidences, investigate the case, and maintain an allegiance to the system of justice as an officer of the court. Two legal principles, however, seem to have emerged from the conundrum generated by the privilege which find common agreement.

■ The beginning premise is a lawyer may not rely upon the privilege to "actively participate in hiding [a fruit or instrumentality of crime], or take possession of it in such a way that its discovery becomes less likely." *Rubin v. State,* 325 Md. 552, 602 A.2d 677, 686 (1992) (quoting 1 Geoffrey Hazard & W. William Hodes, *The Law of Lawyering* § 1.6:401, at 193 (2d ed.1991) (hereinafter "Hazard")). Such an act has no reasonable relationship to the attorney-client privilege and constitutes an abuse of a lawyer's professional responsibilities. *Id.* at 686–87 (citing cases supporting the rule); *see* McCormick § 89, at 328 n.12; *see also* Hazard § 1.6:401, at 193 n.1 (Supp.1992).

■ The second premise in the thicket of problems faced by a lawyer is the attorney-client privilege protects statements by a client revealing the location of the fruits or instrumentality of a completed crime. *Meredith,* 175 Cal.Rptr. 612, 631 P.2d at 51–52, 54; *see* McCormick § 89, at 328; *see also* Hazard § 1.6:303, at 169 (Supp.1993) (there is no situation that calls for stronger application of the confidentiality principle and no exception even arguably applies). The main rationale for the rule requiring disclosure of the fruits and instrumentalities of the crime when taken into possession by the lawyer is that a lawyer must not impede or inhibit the discovery of evidence by the state. *Rubin,*

602 A.2d at 688. However, if defense counsel leaves the evidence alone, the only matter possessed is the communication which remains insulated from disclosure by the attorney-client privilege. *See State ex rel. Sowers v. Olwell,* 64 Wash.2d 828, 394 P.2d 681, 684 (1964). Thus, a defense lawyer has no legal obligation to disclose information about the location of an instrument of a crime when possession of the instrument is not taken. *See Clutchette,* 770 F.2d at 1472. Instead, a defense lawyer has a duty to preserve the confidences of the client.

■ Evidence protected by the attorney-client privilege which the State obtains in the course of a criminal case from counsel and introduces at trial is a paradigm example of the denial of the right to counsel. *See id.* Yet, the duty of a lawyer not to disclose the location of an instrumentality of a crime does not always mean disclosure to the prosecution compromises the right to effective counsel. Disclosure may be justified as a tactical choice or strategy. *Meredith,* 175 Cal.Rptr. 612, 631 P.2d at 54. If the defense lawyer does not take possession of the instrument of the crime, there can be no opportunity to have it examined for any evidence that may be critical to the defense. *Id.* at 53 n. 7. Thus, the particular facts of a case may justify disclosing the location of the instrument of a crime even if disclosure is not legally required and the information is legally protected.

■ In this case, the decision by defense counsel to disclose the location of the knife to the prosecutor was premised upon ethical concerns which did not require disclosure. Although tactical reasons were also considered, these tactics were a response to the faulty premise, not underlying reasons to disclose privileged information. Wemark was informed by his defense counsel that the location of the knife must be disclosed, and tactics were developed as a means to deal with the disclosure. Tactics or strategy cannot support disclosure in this case.

■ Notwithstanding, relief is not granted for claims of ineffective assistance of counsel unless prejudice resulted. To establish prejudice in an action for post-conviction relief, the applicant must show a reasonable probability that the result of the trial would have been different but for counsel's errors. *Osborn v. State,* 573 N.W.2d 917, 922 (Iowa 1998) (quoting *State v. Bugely,* 562 N.W.2d 173, 178 (Iowa 1997)). Reasonable probability means a probability sufficient to undermine the confidence in the outcome of the trial. *Id.*

■ There was overwhelming evidence that Wemark repeatedly stabbed his wife with the knife. Wemark did not deny the stabbing but claimed self-defense, lack of premeditation, and provocation. Although the location of the knife and the forensic evidence discovered from the knife ultimately may have been more helpful to the State than the defense, there was an abundance of other evidence to support premeditation and the lack of provocation independent of the knife. The knife was only a small portion of the host of evidence used by the prosecution to support its claim of first-degree murder. Aside from the evidence that Wemark hid the knife in the basement following the stabbing, there was evidence Wemark changed his clothing following the stabbing and washed Melissa's blood from the clothing he was wearing at the time of the stabbing. There was also evidence Wemark wiped blood from the floor and moved Melissa's body into a bedroom. Wemark never summoned help from neighbors or police, but fled the house. There was further evidence that the knife wounds on his body were largely superficial and self-inflicted, and done only as an after thought to enable him to claim self-defense. There was also evidence Wemark had expressed an intent to kill Melissa on more than one occasion, and was very upset and angry over the estrangement of their marriage. Some of the fifteen stab wounds in Melissa's body were in her back. Considering

all the evidence, the disclosure of the knife did not affect the outcome of the proceedings. Additionally, there was no claim that any other statement or information given to Dr. Taylor by Wemark was used by the State at trial. There was no prejudice.

### B. Other Claims of Ineffective Assistance of Counsel.

#### 1. Influence on Jury.

 Although we acknowledge a duty for defense counsel to be cognizant of outside influences on a jury and to investigate allegations of misconduct, we observe the district court in this case found no credible evidence of any jury misconduct. We give deference to this finding. Furthermore, defense counsel raised the possibility of outside influences on the jury with the district court, including concerns about a public display against domestic abuse. The court responded with appropriate admonitions and protective orders.

We conclude Wemark failed to establish his counsel did not adequately respond to concerns and allegations over possible influences on the jury. Furthermore, Wemark failed to establish any prejudice.

#### 2. Testimony of Medical Examiner.

We find the conduct of defense counsel in responding to the testimony of Dr. Bennett was well within the range of reasonable assistance. The testimony by Dr. Bennett was not inadmissible, and the basis for his opinions were fully explored during this pretrial deposition. There was no evidence to suggest another medical expert would have offered any different opinions than Dr. Bennett. Furthermore, there was no dispute in the substance of Dr. Bennett's testimony.

#### 3. Cumulative Effect.

We conclude Wemark received effective assistance of counsel. Accordingly, there was no cumulative error.

### IV. Conclusion.

We have considered all the claims raised by Wemark in support of his application for postconviction relief. We affirm the district court's denial of postconviction relief.

**AFFIRMED.**