**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0706n.06
Filed: September 29, 2006

**No. 99-1929**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| PAUL ALLEN DYE, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| GERALD HOFBAUER, Warden, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Respondent-Appellee. | ) | |

Before: BOGGS, Chief Circuit Judge, DAUGHTREY, Circuit Judge, and ECONOMUS,[*] District Judge.

**PER CURIAM.** This appeal is before us for the second time, on remand from the Supreme Court following its reversal of our order affirming the district court's judgment on procedural grounds. *See Dye v. Hofbauer*, No. 99-1929, 2004 WL 1922176 (6th Cir. Aug. 24, 2004), *cert. granted*, 546 U.S. ___, 126 S.Ct. 414, *rev'd*, 546 U.S. ___, 126 S.Ct. 5 (2005). We therefore return to a consideration of the merits of the issues raised on appeal from the district court's denial of relief to petitioner Paul Allen Dye on his petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254.

---

[*]The Hon. Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

Dye was tried three times in the state court for the murder of two women in 1982. After the first trial resulted in a hung jury, Dye was convicted at a second trial, but that conviction was overturned by the Michigan Supreme Court based on the prosecution's lack of due diligence in attempting to produce the three key witnesses who had testified at the first trial, offering instead a transcript of their earlier testimony. This petition stems from Dye's conviction of both first- and second-degree murder at the third trial, for which he received a mandatory non-parolable life sentence and a term of 23-40 years, respectively. In his habeas petition, Dye raised numerous claims, alleging (1) a double jeopardy violation; (2) violation of the attorney-client privilege; (3) failure to prove victim identity; (4) prosecutorial misconduct; (5) improper jury polling; (6) admission of evidence in violation of the discovery order; (7) admission of statements to police obtained without *Miranda* warnings; (8) improper use of his pre- and post-arrest silence; (9) an erroneous jury instruction on false exculpatory statements; and (10) denial of an impartial appeal as of right. We conclude that the district court was correct in holding that none of these challenges to the petitioner's conviction merits federal habeas relief.

**PROCEDURAL AND FACTUAL BACKGROUND**

The facts of this case were summarized by the Michigan Supreme Court as follows:

Early in the morning of August 29, 1982, [Donna Bartels and Glenda Collins] were killed in the clubhouse of the Forbidden Wheels Motorcycle Club. They had each been shot through the head. Their bodies were dumped on the curb of a residential street and discovered there by early morning commuters.

> Four club members were in the clubhouse at the time of the murders. Dye, Bruce Seidel, James Dawson, and Steve Stever all admitted to helping clean up the clubhouse after the killings. Seidel, the prosecution's chief witness, accused Dye of killing the women. Dye accused Seidel of being the killer. Dawson and Stever, who had been in an upstairs apartment apparently asleep at the time of the killings, testified that Seidel walked upstairs, awakened them, and told them that Dye had just killed two women. Seidel, Dawson, and Stever further testified that after Seidel and Dye dumped the bodies, all four met in Stever's garage, where Dye admitted to the killings.

*People v. Dye*, 427 N.W.2d 501, 503-504 (Mich. 1988) (footnotes omitted).

Dye was tried three times for these murders. At his first trial, in March 1983, Seidel, Dawson, and Stever testified under a limited grant of immunity. Dye's first trial was declared a mistrial, with the jury voting 11-to-1 to acquit Dye of murder but convict him as an accessory after the fact. The prosecution did not produce Seidel, Dawson, and Stever for the second trial in August 1983; the trial court allowed assistant prosecutors to read the witnesses' earlier testimony to the jury, and Dye was convicted of two counts of first-degree murder and two counts of possession of a firearm during commission of a felony. On appeal, the Michigan Supreme Court reversed and remanded for a new trial, finding that the prosecution had not been sufficiently diligent in attempting to produce the three witnesses for the second trial. *See id.* at 504-511, 513. At the third trial in September 1990, Seidel, Dawson, and Stever testified in person, and Dye was convicted.

After the third trial, the Michigan Court of Appeals affirmed his conviction and the Michigan Supreme Court denied leave to appeal. Dye then filed this petition for writ of habeas corpus, which was initially assigned to a magistrate judge, who recommended

denial of Dye's ten claims for relief, applying the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). Upon Dye's objections to the report and recommendation, the district court asked the magistrate judge to consider whether it was manifestly unjust to apply the AEDPA standard, in light of the appellate delays in state court, and whether Dye would be entitled to a writ of habeas corpus on any of his claims under the pre-AEDPA standard of review. In keeping with the magistrate judge's recommendation, the district court held that the pre-AEDPA standard was applicable in light of the extreme delay in the state appellate process. Even under this standard, however, the court held that Dye's claims for relief failed and dismissed the petition. In doing so, the district court specifically addressed the double jeopardy claim but, as to the other nine claims, adopted the magistrate judge's recommendations.

The district court granted a certificate of appealability with respect to the issue of double jeopardy only. Given the court's prior determination that pre-AEDPA law applied, however, we held that a certificate of appealability was unnecessary and that the petitioner could assert all appropriate claims on appeal. After the Supreme Court's holding that the certificate of appealability governs appellate court proceedings filed after AEDPA's effective date, *see Slack v. McDaniel*, 529 U.S. 473, 482 (2000), we ordered a "grant of certificate of appealability with respect to all the issues involving the petitioner on appeal."

On initial review in this court, a majority of the panel held in a split decision that the petitioner was entitled to relief based on a single allegation of prosecutorial misconduct and

pretermitted discussion of the remaining claims alleged in the petition. *See Dye v. Hofbauer*, No. 99-1929, 2002 WL 2026519 (6th Cir. Aug. 29, 2002). One of the judges on that panel retired from the bench before the judgment of the court became final, however, and on petition to rehear filed by the respondent, the reconstituted panel affirmed the district court's order denying relief, because the record on appeal failed to indicate that the prosecutorial misconduct claim had been framed in terms of a federal constitutional violation when it was raised in state court.

Reviewing on *certiorari* not just the joint appendix filed on appeal in this court but apparently the entire district court record, the Supreme Court noted that in his brief filed in the Michigan Court of Appeals, the petitioner had cited federal cases to support his claim of prosecutorial misconduct and that the claim had been presented with sufficient particularity to merit constitutional review under § 2254. We were admonished on remand that the state court's failure to frame its disposition of claims in terms of federal constitutional case law was not dispositive. An obvious difficulty with this approach, however, is the seemingly contrary statutory directive in § 2254(d) that habeas relief may be granted only if the state court's adjudication of a petitioner's claims resulted in a decision that is contrary to, or an unreasonable application of, clearly established federal constitutional law, as determined by the Supreme Court, or one that is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d). Because none of the rulings of the Michigan Court of Appeals was based on federal constitutional law, except for a finding that prejudice from

an alleged *Miranda* violation "was minimal[]and did not require a retrial," and because the state court's determination of the facts is not at issue, we are left to puzzle out a proper standard of review under AEDPA.

## DISCUSSION

We normally review a district court's disposition of a petition for a writ of habeas corpus de novo. *See Clemmons v. Sowders*, 34 F.3d 352, 354 (6th Cir. 1994). The district court's findings of fact are reviewed for clear error, but with "complete deference to district and state court findings supported by the evidence." *Id.* Because of the unusual procedural posture of this case, we elect to treat all ten of the issues raised in the petition as ripe for review.

## 1. Double Jeopardy

Dye contends that his third trial and conviction violated his right to be free from double jeopardy. Specifically, he maintains that the prosecution's failure to produce the three key witnesses at his second trial was a deliberate attempt to obtain a conviction, especially in light of the first trial, at which 11 jurors voted for acquittal after hearing the witnesses' testimony in person. Dye claims that after the Michigan Supreme Court reversed the conviction for lack of due diligence on the part of the prosecution, the state was precluded from retrying him. Dye raised this issue before his third trial, but the trial court denied the motion.

The district court found that the state's application of Supreme Court precedent to Dye's double jeopardy claim was not unreasonable under the AEDPA standard of review. We conclude that this decision is in accord with controlling case law. The double jeopardy clause prohibits retrial after reversal on appeal if the reversal is for evidentiary insufficiency, because such a finding indicates that the state failed to prove its case. *See Burks v. United States*, 437 U.S. 1, 15-16 (1978). In contrast, reversal for trial error, such as "incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct," indicates that the judicial process is defective and the defendant has "a strong interest in obtaining a fair readjudication." *Id.* at 15. Thus, even if Dye's allegation of prosecutorial misconduct were sustainable, double jeopardy would not preclude retrial.

Dye urges this court to apply *Downum v. United States*, in which the Supreme Court held that double jeopardy attaches after a mistrial at which "[t]he prosecution allowed the jury to be selected and sworn even though one of its key witnesses was absent and had not been found." 372 U.S. 734, 735 (1963). However, the district court held that *Downum* does not apply in this case, because the trial in that case ended in mistrial. In contrast, Dye's conviction was reversed on appeal, and his "valued right . . . to have his trial completed by the particular tribunal summoned to sit in judgment on him" was therefore not abridged. *Id.* at 736. We agree, having previously recognized this same distinction:

> [Petitioner's] double jeopardy claim is [ ] without merit. He argues that the State should be barred from retrying him because its own misconduct led to the reversal of his first conviction. Even accepting that characterization of the trial error which caused the appellate reversal, it would not affect the

>State's right to retry him. *See Burks v. United States*, *supra*. His attempt to analogize his situation to cases where retrial has followed a mistrial provoked by prosecutorial misconduct is unavailing. In such cases, retrial is disapproved principally because the misconduct resulting in a mistrial has deprived the defendant of "(the) valued right to have his trial completed by a particular tribunal." *Wade v. Hunter*, 336 U.S. 684, 689 [ ] (1949). *See also United States v. Jorn*, 400 U.S. 470, 483-85 [ ] (1971) (plurality opinion of Harlan, J.). [Petitioner's] first trial proceeded all the way to verdict, and, consequently, he fully enjoyed that right.

*Gully v. Kunzman*, 592 F.2d 283, 289-290 (6th Cir. 1979). In light of the fact that Dye's second trial was reversed for trial error, that the evidence was sufficient to prove the state's case, and that Dye was not denied the valued right to have his trial completed by a particular tribunal, the district court correctly found that Dye's third trial did not violate the double jeopardy clause.

## 2. Attorney-Client Privilege

Dye maintains that the only evidence incriminating him, the testimony of Seidel, Dawson, and Stever, was obtained in contravention of the attorney-client privilege, in violation of his Sixth and Fourteenth Amendment rights. Attorneys Michael Finn and William Van Dusen were retained by Dye, as president of the Forbidden Wheels Motorcycle Club, to offer advice with respect to search warrants for the motorcycle clubhouse. After the murder, Seidel, Dawson, and Stever met with Finn and Van Dusen, who arranged a deal for these witnesses to provide testimony concerning the murders in exchange for immunity for their roles as accessories after the fact. Dye claims that he had retained Finn and Van Dusen as attorneys for all the club members and that the

- 8 -

information gained by the attorneys through interviews with club members, including Seidel, Dawson, and Stever, was protected. Indeed, the Attorney Grievance Commission admonished Finn and Van Dusen for accepting a fee to represent all club members but then representing only some club members (Seidel, Dawson, and Stever) to Dye's detriment. As the magistrate judge noted, however, it is not clear whether a violation of the attorney-client privilege actually occurred, as there is no evidence that Seidel, Dawson, and Stever revealed communications that Dye had with the attorneys.

But even if there were a violation of the attorney-client privilege, it did not amount to a deprivation of Dye's constitutional rights. The attorney-client privilege is a creation of common law, and a violation of this privilege generally does not constitute grounds for habeas relief. Although government interference with a defendant's relationship with his counsel may constitute a Sixth Amendment violation, that was not the case here, given the fact that the state's role was entirely passive; through the attorneys, Seidel, Dawson, and Stever approached the state voluntarily. *See, e.g., Cluchette v. Rushen*, 770 f.2d 1469, 1472 (9th Cir. 1985). Moreover, as the magistrate judge pointed out, the Sixth Amendment applies only after the government has moved beyond investigation to accusation and, therefore, that no constitutional rights had attached when Seidel, Dawson, and Stever approached the police while they were still investigating the murders.

Likewise, Dye's fourteenth Amendment challenge is without merit. By its express wording, that amendment protects citizens against deprivations of life, liberty, or property

by a *state.* The individual acts of Seidel, Dawson, and Stever thus did not implicate those constitutional guarantees.

**3.** Proof of Victim Identity

Dye next contends that the prosecution was required to prove the identity of the victims beyond a reasonable doubt but failed to prove that one of the victims was Donna Bartels. The prosecution presented testimony from Seidel that the victims had introduced themselves as Glenda and Donna and that Dye shot Donna after shooting Glenda. An autopsy of a woman identified by her friends as Donna Bartels indicated that she had died of a gunshot wound to the head. Further, in denying Dye's motion for a new trial, the trial judge found sufficient circumstantial evidence of Donna Bartels's identity based on "the testimony of Theresa Gray [Bartels's friend] and the testimony of Bruce Seidel regarding the photographs of the victim and testimony of the police witnesses and the medical examiner about particular markings on the victim's body." Viewing the evidence in the light most favorable to the prosecution, we have no difficulty in concluding, as did the magistrate judge, that there was sufficient circumstantial evidence for a rational trier of fact to find that the identity of the murdered woman was Donna Bartels.

**4. Cumulative Prosecutorial Misconduct**

Dye next contends that the cumulative effect of seven instances of prosecutorial misconduct denied him a fair trial by improperly appealing to juror sympathy, exciting juror

prejudices, vouching for the truth of the prosecution's case, and denigrating Dye's credibility. The instances of alleged prosecutorial misconduct are: (1) informing the jury that Dye previously had been convicted in this case by claiming in the opening argument that the former prosecutor "chewed [Dye] up and spat him out . . . [by testing] the truth of what Mr. Dye said," and "you will see . . . that when Mr. Dye testified before under oath trying to save his own neck his own version was a lie"; (2) injecting the specter of organized crime into the trial through an investigator's testimony that he knew of one of the victim's involvement with motorcycle clubs through the police organized crime section, which had a unit focusing on motorcycle clubs; (3) arguing facts not in evidence by fabricating a conflict in Dye and Seidel's testimony to show that Seidel's testimony, and not Dye's, was supported by the physical evidence; (4) intimating that Dye had threatened a witness, who had changed her testimony that Seidel had known one of the victims after talking with Dye; (5) eliciting victim sympathy and inciting juror passion against Dye by stating that the "butchered" and "bloodied" bodies were discovered "lying there like a couple of bags of garbage that had been discarded"; (6) making unrelated allegations of Dye's sexual infidelity by pointing out that Dye had been to a topless bar before the murders, in keeping with the prosecutor's theory that Dye killed the women because his sexual advances were rejected; and (7) improperly vouching for the truth of the prosecution's case by stating in his closing arguments, "[I]f being thorough was a crime they ought to throw the book at me because I try to be thorough to let you have all available evidence to decide this case."

The magistrate judge carefully analyzed each allegation of prosecutorial misconduct and concluded that none entitled Dye to habeas relief. We agree with each of the individual findings. In the context of the three-week trial, the instances of alleged prosecutorial misconduct were isolated, and their cumulative effect did not render Dye's trial fundamentally unfair.

## 5. <u>Jury Polling Error</u>

In his fifth claim of error, Dye points out that one of the jurors had expressly stated "not guilty" when initially polled and maintains that the subsequent events coerced the juror into voting guilty, thereby denying Dye the right to a unanimous verdict. In denying Dye's motion for a new trial, the trial court explained that when juror 10 was polled, the judge asked her to repeat her answer because he did not hear her clearly, although the record indicates that the court reporter heard the juror respond "no," as in "not guilty." When the juror replied that her answer was "yes," the trial court asked her whether that was what she initially said and the juror answered, "No." The rest of the jury was polled, then the judge again polled juror 10, who reiterated that her answer was "guilty." After some discussion out of the jury's presence, the judge brought juror 10 back in alone to verify that her verdict was "guilty." The magistrate judge correctly found that juror 10 was initially confused by the question, and that the judge's further questioning was intended to clarify, not coerce, her response. The jury poll did not deprive Dye of a fundamentally fair trial, and Dye is not entitled to habeas relief on this claim.

6. **Improper Use of Undisclosed Evidence**

Dye claims that he was deprived of due process by the prosecutor's use of evidence that was not disclosed to Dye in contravention of a discovery order. Through the testimony of Glenda Collins's father, the prosecution introduced evidence that Collins's address book which was no longer available, contained the name "Rocky." Because Dye's nickname was Rocky, the prosecution apparently intended to rebut Dye's testimony that he did not know the victims. Dye's nickname was not revealed at trial, and before closing arguments the trial judge instructed the jury to ignore the reference to the address book. The magistrate judge correctly found that the admission of the address book did not deprive Dye of a fundamentally fair trial; there is no constitutional right to discovery of non-exculpatory evidence and nothing indicates that the jury was unable to follow the curative instruction.

7. **Privilege Against Self-Incrimination: Statements Before *Miranda* Warnings**

Dye maintains that his privilege against self-incrimination was violated by the admission of statements he made to a police arson investigator without receiving *Miranda* warnings. According to Dye, he had agreed to talk with Lieutenant Peck about fire-bombings committed by the prosecution's three main witnesses after his attorney told him that he had made a deal with Peck that Dye's statements would not be used against him at trial. The prosecution elicited testimony from Peck that Dye admitted to being present,

though not a participant, when Seidel firebombed a house. Denying Dye's motion for a new trial, the trial court noted that Peck said nothing about the murders, nor would one expect that Peck, an arson investigator, had questioned Dye about the murders.

The magistrate judge reasoned that, to the extent there was any error, it was harmless. This was also the position taken by the Michigan Court of Appeals:

> We conclude that although defendant's statement was improperly admitted, any resulting prejudice was cured by the trial judge's jury instruction. Defendant's statement regarding the firebombings was far from a damaging confession. He accused Stever and Dawson of one firebombing, and Seidel of the other. While defendant admitted being present when Seidel committed the June 10 firebombing, the trial judge promptly instructed the jury that presence at the scene of a crime did not indicate guilt, and instructed the jury to disregard any implication that defendant was involved in the firebombings. The trial judge also barred the prosecutor from arguing that defendant's failure to mention the murders to Peck constituted a suspicious omission. Under the circumstances, Peck's testimony regarding defendant's statement about the bombings seems to bolster defendant's theory that Seidel killed the victims because they heard Dawson and Stever state that they had just firebombed a house. Nor did the prosecutor appear to be acting in bad faith when he introduced Peck's testimony; our review of the record indicates that the prosecutor was genuinely surprised by the information that Peck obtained defendant's statement in violation of *Miranda*. Any prejudice was minimal, and did not require a mistrial.

We agree that the petitioner was not entitled to relief on the basis of this claim.

## 8. <u>Privilege Against Self-Incrimination: Pre- and Post-Arrest Silence</u>

Dye claims that his due process and Fifth Amendment rights were violated by the prosecution's use of his pre- and post-arrest silence. During opening arguments, the

prosecutor told the jury that Dye was going to testify that Seidel had committed the murders, referring to testimony that the defendant had given at the previous trials. The prosecution explained at length that the jury should not believe Dye because he had not made this allegation during his several conversations with homicide and arson investigators before his arrest, to the officer when he was arrested, or to the arson investigator after his arrest. We conclude that the magistrate correctly found that these references did not violate the defendant's right to remain silent for the very reason that he did not invoke that right but, instead, spoke with officers on more than one occasion about *Seidel*'s involvement in the firebombings, yet never alleged that *Seidel* had committed the two murders. Obviously, any reference to this omission was not an improper comment on Dye's "silence," as prohibited by *Griffin v. California*, 380 U.S. 609 (1965), but was intended to convince the jury that Dye had fabricated his accusation against Seidel sometime after his initial interrogation by police. Under such authority as *Anderson v. Charles*, 447 U.S. 404, 408 (1980), we find no Fifth Amendment violation in this regard.

## 9. Jury Instruction on Petitioner's False Exculpatory Statement

Dye maintains that the trial court's instruction on his false exculpatory statement misstated the law, improperly influenced the verdict by impugning every element of his testimonial defense, and relieved the state of its burden of proving every element of the crime beyond a reasonable doubt. The magistrate judge correctly rejected these assertions. Contesting the instruction that false exculpatory statements are "circumstantial

evidence of guilt," Dye states that, under the proper state law, false exculpatory statements are "circumstantial evidence of *consciousness* of guilt." The Michigan Court of Appeals and the magistrate judge concluded that the instruction as given was a correct statement of the law. Assuming arguendo that Dye's instruction reflects the current state of the law, his own argument recognizes that the trial court's instruction was a correct statement of the law at the time it was given and, indeed, until the law was clarified six years after the trial. *Compare and contrast People v. Wolford*, 473 N.W.2d 767, 769 (Mich. App. 1991), *with People v. Mooney*, 549 N.W.2d 65, 70 (Mich. App. 1996).

Dye's next contention is that the trial court improperly failed to identify for the jury which specific exculpatory statement they could consider. As the magistrate judge found, however, the prosecution repeatedly pointed out that Dye's testimony conflicted with the blood stain evidence, and the trial court clearly instructed the jurors that it was for them to determine whether Dye had made any false exculpatory statements. Moreover, Dye has cited no cases holding that a trial court must instruct a jury on which specific exculpatory statements it may consider to be false.

## 10.  Denial of an Impartial Appeal as of Right

Dye's final claim is that, by revoking his bond sua sponte following its decision in his direct appeal, the Michigan Court of Appeals reflected a bias against him that amounted to the denial of his right to an impartial review of his conviction. The authority to grant and revoke bail is, of course, an inherent judicial function. Moreover, as the magistrate judge

noted, Dye pointed to nothing to indicate that the Michigan appeals panel was biased, or was influenced by any extra-judicial source, or had stepped outside of its judicial role. There simply is no basis for a grant of habeas relief in this regard.

## **CONCLUSION**

For the reasons set out above, we AFFIRM the judgment of the district court.

PETER C. ECONOMUS, District Judge, dissents from the order affirming the judgment of the district court for the reasons set out in his initial opinion in this case. *See Dye v. Hofbauer*, No. 99-1929, 2002 WL 2026519 (6th Cir. Aug. 29, 2002).