551 N.W.2d 189 (1996)
PEOPLE of the State of Michigan, Plaintiff-Appellee,
v.
Paul Allen DYE, Defendant-Appellant.
Paul Allen DYE, Plaintiff,
v.
MICHIGAN COURT OF APPEALS, Defendant.
Nos. 105896, 106427, COA No. 136707.
Supreme Court of Michigan.
August 2, 1996.
On order of the Court, the delayed application for leave to appeal, the motion for immediate consideration, the complaint for superintending control, and the motion for stay are considered. The motion for immediate consideration is GRANTED. The application for leave to appeal is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court. The complaint for superintending control is moot and is therefore DISMISSED. The motion for stay also is moot and is therefore DENIED.
We do not retain jurisdiction.
LEVIN, Justice, states as follows:
I would grant leave to appeal.

I
Defendant, Bruce Seidel, James Dawson and Steve Stever were all members of the Forbidden Wheels Motorcycle Club. According to the prosecution, defendant and Seidel went to a topless bar on the night of August 29, 1982, and then returned to the Forbidden Wheels clubhouse. After the two arrived at the clubhouse, Glenda Collins and Donna Bartels showed up at the club and were let in by Seidel. Defendant and the two women then proceeded to drink and play pool.
The prosecutor further contends that soon after, defendant began "betting" Collins that she would perform oral sex on him. She replied that she would not. Defendant became more adamant about the bet as he continued to serve drinks, according to Seidel, from behind the clubhouse bar, and, when Collins continued to refuse, he grabbed the back of Collins' head, pulled her towards him and then shot her in the forehead. Defendant then turned and shot Bartels, an eyewitness, as well.
Seidel, Stever, and Dawson testified that defendant admitted killing the women and *190 persuaded them to help him clean up.[1] These witnesses received immunity in exchange for their testimony against defendant.
Defendant told a different story. He admits that he and Seidel went to the topless bar and that the women showed up later at the clubhouse, but claims that Seidel did the killing while high on mescaline. Defendant maintains that he was asleep at the time of the murders, and awoke on the first shot, and stood up on the second shot, and saw Seidel standing at the end of, and in front of, the bar.
The prosecutor's version of the events was supported by the testimony of a State Police serologist who testified that the pattern of blood stains and tissue deposits show that the murderer was standing behind the bar when the gun was fired.[2] The serologist did not view the scene and relied on photographs. Defendant asserted that he was not, as Seidel testified, standing behind the bar when the gun was fired, but rather was sleeping, and argued that Seidel could have moved to the front of the bar after firing the first or second shot from behind the bar. The serologist's testimony did not necessarily resolve the credibility issue whether it was Seidel or the defendant who told the truth.
Defendant was tried three times and eventually found guilty of first-degree premeditated murder, second-degree murder, and possession of a firearm during the commission of a felony at his third trial on September 25, 1990. The Court of Appeals affirmed.

II
Defendant raises a number of possibly meritorious issues. The first relates to defendant's dealings with an investigator. Defendant apparently met with the investigator and agreed to waive his Miranda[3] rights if the investigator promised that anything that defendant said would not be used against him. During this meeting, defendant told the investigator that he had perpetrated a firebombing with Seidel a few months earlier.
At trial, on direct examination, the investigator revealed defendant's participation in the firebombing. On cross-examination, defense counsel brought out the agreement and, out of the presence of the jury, asked that a mistrial be declared. Although the prosecutor conceded that defendant's statements were being used against him in violation of the agreement, the judge denied a mistrial and gave a "curative" instruction.
The investigator's testimony tended to show that defendant had a general disregard for human life and, therefore, was the kind of person who might have taken the two victims' lives.

III
The most critical issue relates to the prosecution's use of defendant's prearrest silence against him. The prosecutor argued that defendant's story should not be believed because he failed to tell it to investigators despite numerous opportunities to do so.[4] Defendant requested a mistrial. The judge denied this request, but prohibited the prosecutor from mentioning the defendant's prearrest silence during closing argument.
Seidel was once one of defendant's friends. According to defendant's story, he, the defendant, helped clean up after the murder and therefore could have been held as an accomplice. I can understand why defendant might not have wanted to tell the police about the murder until Seidel testified against him. See People v. Collier, 426 Mich. 23, 34, 393 N.W.2d 346 (1986) (evidence of prearrest silence should not be offered when silence was "natural" given the circumstances); People v. Dye, 431 Mich. 58, 81-82, 427 N.W.2d 501 (1988).

*191 IV
The defendant contends that error requiring reversal was committed when the trial court refused to rule on the admissibility of one of the victim's address books until the end of the trial. Early in the trial, defendant testified that he had never seen the victims before the night of their murders. The prosecutor subsequently called Collins' father to testify that he saw his daughter's address book, and that it contained the name "Rocky".[5] This obviously tended to rebut defendant's earlier claim that he had never before met Collins, and hurt his credibility in general.
Defendant objected to the testimony on the ground that it violated a standing discovery order (which it did). The judge did not rule in defendant's favor on the issue until near the end of the trial. Then he gave a "curative" instruction.
This was prejudicial to defendant in light in the circumstance that the trial essentially amounted to a credibility contest between defendant and Seidel.
NOTES
[1] Stever and Dawson were upstairs at the time of the shooting.
[2] The facts are further set forth in People v. Dye, 431 Mich. 58, 94-97, 427 N.W.2d 501 (1988).
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] The prosecutor stated at trial, "If [defendant's story that Seidel committed the murders] is really true, what took Mr. Dye so long to come forward with his story."
[5] Prosecutor: Were there any entries in that that would relate to Paul Dye?

Collins: There were names in it, different names.
Prosecutor: Okay.
Collins: One name in particular was the name Rocky in the book.