**Paul Allen DYE, Appellant,**

v.

**Gerald HOFBAUER, Appellee.**

**No. 99–1929.**

United States Court of Appeals,
Sixth Circuit.

Aug. 29, 2002.

Daughtrey, Circuit Judge, dissented
and filed opinion.

Before JONES,* DAUGHTREY,
Circuit Judges; and ECONOMUS,
District Judge.**

**OPINION**

PETER C. ECONOMUS, District
Judge.

### I. OVERVIEW

The petitioner, Paul Allen Dye ("Dye"),
a Michigan prisoner convicted of first-and
second-degree murders, appeals from the
district court's judgment denying his 28
U.S.C. section 2254 petition for a writ of
habeas corpus. The petition alleged, *inter
alia,* prosecutorial misconduct.[1] For the

---

* This opinion was submitted to the court prior
to Judge Nathaniel R. Jones' departure from
the court effective April 2, 2002.

** The Honorable Peter C. Economus, United
States District Judge for the Northern District
of Ohio, sitting by designation.

1. Other claims raised by Dye in the petition
include: double jeopardy; Fourth and Sixth
Amendment violations rights by means of a
breach of the attorney-client privilege; failure

to prove victim identity; improper jury poll-
ing; admission of evidence in violation of the
discovery order; admission of statements to
police obtained absent *Miranda* warnings;
improper use of pre-arrest silence and post-
arrest silence; an erroneous jury instruction
on false exculpatory statements; and the de-
nial of an impartial appeal of right. We have
no occasion to address these remaining issues
as we determine that Dye's claims of prosecu-

reasons set forth below, we find that the prosecutor's misconduct was of a sufficient magnitude to violate Dye's right to due process of law. Accordingly, we RE-VERSE the decision of the district court and issue the writ.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Following three separate trials, including a mistrial, and a successful appeal to the Michigan State Supreme Court, a jury convicted Dye of first degree premeditated murder, Mich. Comp. Laws. Ann. § 750.316, second degree murder, Mich. Comp. Laws Ann. § 750.317, and possession of a firearm during the commission of a felony, Mich. Comp. Laws Ann. § 750.227 b. (J.A. at 174). Dye was sentenced to a life sentence without the possibility of parole; a concurrent twenty-three (23) to forty (40) year term; and a consecutive two (2) year term, respectively. (J.A. at 174).

### A.

During the early morning hours of August 29, 1982, Glenda Collins ("Collins") and Donna Bartels ("Bartels"), patronized the Forbidden Wheels Motorcycle Club ("FWMC" or "Club") where they encountered Dye and fellow FWMC member, Bruce Seidel ("Seidel"). (J.A. at 51). While the foursome consumed alcohol and played billiards, FWMC members, James Dawson ("Dawson"), and Steve Stever ("Stever"), entered the Club.[2] Dawson and Stever acknowledged the presence of the foursome and withdrew to the second floor. (J.A. at 52). Collins and Bartels were later found murdered by an early morning commuter, their bodies left in a vacant lot. (J.A. at 611).

Dye was first tried for the murders in March, 1983. Dawson, Seidel, and Stever testified on behalf of the prosecution in exchange for immunity, and implicated Dye as the shooter. (J.A. at 202–203; Final Appellant's Br. at 9). Particularly damaging to Dye was the testimony of Seidel, who presented an eyewitness account of the murder. (J.A. 749–752).

Seidel testified that the murders occurred in the following manner: Seidel and Dye were standing on the service side of the bar, where Dye was engaged in conversation with Collins and Bartels, who were sitting on the opposite side of the bar (the patron side).[3] (J.A. at 736–737). A verbal argument arose between Dye and Collins as to whether Collins would perform oral sex on Dye. (J.A. at 747–748). Seidel, uninterested, retreated to the opposite end of the bar. (J.A. at 744). When Collins persisted in rejecting Dye's advances, Dye reached across the bar, grabbed the back of Collins's head, placed the barrel of the gun to Collins's forehead,

torial misconduct are sufficiently egregious as to warrant habeas relief.

**2.** The record indicates that Dawson and Stever allegedly entered the clubhouse excited and exclaiming that they had just firebombed the house of the mother of a former FWMC president. (J.A. at 996–999). Seidel admonished them for talking about the incident in front of the women, who were not club members. (Tr. People v. Dye, Case No. 82–05617, Vol. III, March 7–8, 1983, at 164–165) Dawson and Stever then retreated to the upstairs of the club to watch the fire. (J.A. at 999).

**3.** The clubhouse itself is a rectangle shaped facility with several couches placed on the outer walls, a pool table toward the south end, as well as a bar along the northern wall of the clubhouse. The murders took place in the bar area. The bar runs north and south, with the patron side for customers on the west side of the bar while the service side is on the east side of the bar. (Diagram, Filed May 21, 2001).

and shot her. (J.A. at 749). Expecting that Dye would then shoot Bartels, Seidel turned his head to avoid witnessing the execution. (J.A. at 751). Seidel heard a second shot, waited a few seconds, then turned around and observed Dye on the patron side of the bar standing between the two bodies. (J.A. at 752).

Dye testified in his own defense and implicated Seidel as the shooter. Dye testified that he fell asleep on a couch shortly after he and Seidel returned to the Club. (J.A. at 1001–1004). Dye was awakened abruptly by a loud noise and he sat up on the couch. (J.A. at 1004). Dye then heard a second noise. (J.A. at 1004). Following the second noise, Dye stood to get a view of what was happening and saw Seidel at the end of the bar, on the patron side, among the two bodies. (J.A. at 1004–1005).

The first trial resulted in a hung jury. (J.A. at 41). Later polling demonstrated that the jury deadlocked at an eleven to one vote, the majority voting to acquit Dye. (J.A. at 41).

In August, 1983, Dye was re-tried for the murders of Collins and Bartels. The prosecution failed, however, to locate Dawson, Stever, and Seidel, and consequently, the prosecution read the prior testimony into evidence. *See, People v. Dye*, 431 Mich. 58, 63, 90, 427 N.W.2d 501, 504, 516 (1988). Dye again testified in own his defense and implicated Seidel as the shooter. (J.A. at 1066–1069).

During their deliberations, the jury twice requested the trial judge to declare a hung jury. Each time the judge instructed the jury to continue their deliberations.

*See, People v. Dye*, 431 Mich. 58, 427 N.W.2d 501 at 503 n. 3. The jury eventually returned a verdict convicting Dye of the two murders. *Id.* at 503.

On August 2, 1988, the Michigan State Supreme Court overturned Dye's conviction. *See, People v. Dye*, 431 Mich. 58, 427 N.W.2d 501 (1988). The court determined that the prosecution failed to exercise due diligence in attempting to locate Dawson, Stever, and Seidel, and, therefore, the prior testimony was improperly read into evidence. *Id.* at 510–11.[4] The case was remanded back to the trial court.

The third trial serves as the basis of the instant petition. There, the prosecutor presented the State's case in the same manner as in the first trial, with one significant exception. For the first time in the history of this case, the prosecutor introduced the expert testimony of State Police serologist, Bob H. Avery ("Avery"), who testified that the crime scene photographs revealed that the shooter was standing behind the bar when the gun was fired. (B.A. at 989).[5] Avery discerned this evidence from analyzing the pattern of blood and tissue deposits on the ceiling of the Club. (B.A. at 1016). This testimony supported Seidel's account of the murders, insofar as, the shooter was standing behind the bar when the murders were committed.

Dye again testified on his own behalf. (J.A. at 983). Dye asserted that he was not, as Seidel testified, standing behind the bar when the gun was fired, but again asserted that he was sleeping. (J.A. at 1062–1063). Dye further asserted that it was possible that Seidel moved to the pa-

---

4. Petitioner alleges here, and provides supporting documentation, that the prosecutors facilitated the witnesses' unavailability between the first and second trials.

5. B.A. refers to the testimony of Bob Avery, the expert witness. It was not included in the joint appendix. The separate document is from the transcript of Bob Avery's testimony at the third trial, hereinafter cited to as "B.A."

tron side of the bar after firing the first or second shot from behind the bar.

On September 25, 1990, the jury convicted Dye of first degree premeditated murder, second degree murder, and possession of a firearm during the commission of a felony. (J.A. at44). Dye immediately filed his appeal of right. (J.A. at 44). Four years later, the Michigan Court of Appeals affirmed the conviction. (J.A. at 174). The Michigan Supreme Court thereafter denied leave to appeal. *People v. Dye,* 450 Mich. 909, 543 N.W.2d 310 (Table) (1995).

**B.**

On September 27, 1997, Dye filed his petition for a writ of habeas corpus pursuant to 28 U.S.C. section 2254. The case was referred to a magistrate judge, who, in applying the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (Apr. 24, 1996), recommended that the petition be denied. (JA, 231–313) Dye objected to the report and recommendation. (J.A. at 314–403).

The district court thereafter requested the magistrate judge to consider (1) whether it was manifestly unjust to apply the AEDPA standard in light of the appellate delays; and (2) whether Dye would be entitled to a writ of habeas corpus on any of his claims under the pre-AEDPA standard of review. (J.A. at 435). The magistrate judge responded in the affirmative to the first inquiry, but, nevertheless, recommended that the petition be denied. (J.A. at 438–461). In keeping with the magistrate judge's recommendation, the district court held that the pre-AEDPA standard was applicable in light of the extreme delay in the appellate process and it denied the petition. (J.A. at 499–506).

On September 1, 1999, the district court granted a certificate of appealability with respect to the sole issue of double jeopar-

dy. (J.A. at 527). Because the district court applied pre-AEDPA law, however, a certificate of probable cause was required. *See, Sixth Circuit Docket Sheet* for 99–1929, Jan. 27, 2000. Consequently, this Court ordered that a certificate of appealability was thereby unnecessary and the parties could assert all appropriate claims on appeal. *Id.*

Meanwhile, the United States Supreme Court issued its decision in *Slack v. McDaniel,* 529 U.S. 473, 482, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), and this Court accordingly ordered a "grant of certificate appealability with respect to all the issues involving petitioner on appeal." *Sixth Circuit Docket Sheet* for 99–1929, May 2, 2000. Accordingly, Dye's claims are properly before this Court for review.

**III.  LAW AND DISCUSSION**

**A.  Standard of Review**

Notwithstanding the district court's determination that it would be unjust to apply the post-AEDPA standard of review to the instant petition, it is now well settled Federal law that the AEDPA governs habeas petitions filed subsequent to April 24, 1996. *See, Slack,* 529 U.S. at 482 (2000), *Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Brumley v. Wingard,* 269 F.3d 629, 637 (6th Cir.2001). As Dye filed his habeas petition on September 22, 1997, the AEDPA governs our review.

Pursuant to the provisions of the AEDPA, a Federal court is authorized to grant a writ of habeas corpus to a person in custody pursuant to a state court judgment, but only if the adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Feder-

al law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

"A federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly. Rather, the application must also be unreasonable." *Id.* at 411. Finally, a district court's denial of the writ is subject to *de novo* review. *See, Rogers v. Howes,* 144 F.3d 990, 992 (6th Cir.1998).

### B. Cumulative Prosecutorial Misconduct

Dye asserts that he was deprived of his rights to a fair trial and to due process as secured by the Fourteenth Amendment because of the cumulative effect of several instances of prosecutorial misconduct. (Final Appellant's Br. at 36). Dye alleges specifically that the prosecutor improperly misrepresented facts to the jury, appealed to juror prejudices, vouched for the truth of the prosecution's witnesses, and denigrated his credibility. *Id.* at 36–37. Undeniably, if demonstrated, such conduct on the part of the prosecutor is improper. *See, Donnelly v. DeChristoforo,* 416 U.S. 637, 646, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)(holding that misrepresenting facts in evidence may amount to substantial error because doing so "may impress a jury and may have a significant impact on the jury's deliberations"); *Boyle v. Million,*

201 F.3d 711 (6th Cir.2000)("[a]rguments that appeal to class prejudices, encourage juror identification with crime victims, or vouch for the defendant's guilt would each be deemed beyond ethical bounds"); *United States v. Francis,* 170 F.3d 546, 551 (6th Cir.1999) (determining that improper vouching for a government witness "occurs when the prosecutor implies that the witnesses' testimony is corroborated by evidence known to the government but not known to the jury"); *Caldwell v. Russell,* 181 F.3d 731, 737 (6th Cir.1999)("Ordinarily a prosecutor may not express a personal opinion concerning the guilt of the defendant or the credibility of trial witnesses, because such personal assurances of guilt or vouching ... improperly invites the jurors to convict the defendant on a basis other than a neutral independent assessment of the record proof").

In support of his claim, Dye cites the following seven (7) instances of prosecutorial misconduct:

(1) informing the jury that Dye previously had been convicted of the murders by claiming in the opening statement that the former prosecutor" chewed [Dye] up and spat him out [by testing] the truth of what Mr. Dye said," and "you will see that when Mr. Dye testified before under oath trying to save his own neck his own version was a lie" (J.A. at 117);

(2) injecting the specter of organized crime into the trial by presenting the testimony of an investigator who stated that the investigator knew of one of the victim's involvement with motorcycle clubs through the police organized crime section (J.A. at 119);

(3) intimating that Dye had threatened a witness, who subsequently changed her testimony (J.A. at 123);

(4) eliciting victim sympathy and inciting juror passion against Dye by stating

that the "butchered" and "bloodied" bodies were discovered "lying there like a couple of bags of garbage that had been discarded" (J.A. at 124);

(5) accusing Dye of sexual infidelity by pointing out that Dye had been to a topless bar before the murders, in keeping with the prosecutor's theory that Dye killed the women because his sexual advances were rejected (J.A. at 126);

(6) improperly vouching for the truth of the prosecution's case by stating in his closing arguments, "[I]f being thorough was a crime they ought to throw the book at me because I try to be thorough to let you have all available evidence to decide this case." (J.A. at 128); and

(7) misstating evidence by fabricating a conflict between Dye and Seidel's testimony in order to demonstrate that Seidel's version of the murders, and not Dye's, was supported by the serologist's testimony (J.A. at 120–21).

We find that the last instance, the prosecutor's misrepresentation of witness testimony, is sufficiently egregious to warrant habeas relief.

Dye asserts that the prosecutor misrepresented witness testimony by stating that: (1) Dye previously had testified that Seidel shot the women from the patron side of the bar, (2) Dye and Seidel's versions conflicted with respect to the location of the murderer when the victims were shot, (3) the serologist's findings supported Seidel's version; and (4) Dye's version was, therefore, a lie.

A review of the record supports Dye's allegations. In his opening argument, the prosecutor stated:

And ladies and gentlemen, Mr. Dye got on the stand. You can tell that line has some applicability to this case. Because, ladies and gentlemen, you have two essentially different ways in which the shooting happened. Mr. Seidel says that Mr. Dye was standing behind the bar shooting outward towards the patron side. **Mr. Dye's version essentially says that Mr. Seidel is somewhere on the patron side shooting these two ladies.**

(J.A. at 632–633) (emphasis added).

The prosecution further stated:

And that after Mr. Dye testified at his second trial, after I was assigned to this case, I had the photographs sent to the Michigan State Police Crime Laboratory at Northville and at Bridgeport for them to look at those photographs and to see whether or not that pattern [of blood stains on the ceiling tiles in the barroom] could in any way assist in determining whose version was right.

And when you hear the testimony of the Michigan State Police, you will hear them say that for this shot to have occurred Ms. Collins' head would have had to have been underneath this overhang some distance and that the shot would have to have been fired in a westerly direction [from behind the bar]. And you will be able to see that very graphically in some of the photographs because you will see that the blood went straight up.

(J.A. at 633).

The prosecutor then concluded this segment of the opening statement:

So you will see, ladies and gentlemen, that when Mr. Dye testified before under oath trying to save his own neck his own version was a lie ... Well here he did something a lot more serious than lying about taking some cookies. He lied about a murder ... he tried to lie his way out of it under oath.

(J.A. at 634–35).

The prosecutor made similar comments in his closing statement:

**434**

[Dye] puts Mr. Seidel right smack at the corner of the bar now you tell me, ladies and gentleman, if a person is standing there, has shot two women how the heck you can get blood stains more than four feet to the north and even more difficult than that if the woman is sitting here and Mr. Seidel is on the patron side of the bar here, how in the heck can you have a shot go from behind the bar outward? It's physically impossible . . .

So when we look at something that's objective, we look at the photographs that were taken at the scene, we look at the diagram that was prepared by Mr. Dawson, we look at the drawing that Mr. Dye himself did, you will come to the conclusion that the physical evidence, the objective evidence, the things that don't lie, contradict Mr. Dye and show that his version is not and cannot be accurate.

(J.A. at 1141).

The prosecutor concluded:

But ladies and gentlemen, from the way that she [Collins] was killed, from the way that her blood and brain matter went up on to the ceiling, she was able in a sense to reach out from the grave and to point out Mr. Dye.

Ladies and gentlemen, the evidence in this case that came from Ms. Collins, brains and blood on the ceiling, proves beyond any doubt that Mr. Dye is the fellow that did that to her.

(J.A. at 1141–1142).

The forgoing statements reveal that the prosecutor placed great emphasis on the serologist's expert conclusion that the shooter was standing behind the bar, and that such "objective evidence" disproved Dye's account that Seidel fired the weapon from the patron side of the bar. (J.A. at 633–635, 1141).

Ordinarily, a prosecutor's efforts to discredit a defendant's testimony by contrasting it with other evidence of a crime is proper, if not, required for a successful and thorough prosecution. The prosecutor must be ever mindful, however, that when drawing such contrasts, she must accurately represent the defendant's testimony. *Washington,* 228 F.3d at 709 (citing *Martin v. Parker,* 11 F.3d 613, 616–17 (6th Cir.1993)). Such strict accuracy is required because "a jury generally has confidence that a prosecuting attorney is faithfully observing his obligation as a representative of a sovereignty." *Id.* at 700 (citing *Berger v. United States,* 295 U.S. 78, 84, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). In the instant matter, the record demonstrates that the prosecutor failed to comply with this obligation when summarizing witness testimony to the jury.

Dye's testimony during the prior two trials lacks any indication that he witnessed Seidel shoot the women from the patron side of the bar. To the contrary, Dye testified that he was sleeping at the time of the first shot, which awakened him. (Tr. People v. Dye, Case No.82–05617, Vol. III, March 7–8, 1983, ("Tr. First Trial") at 168–169). Dye further testified that by the time he stood up and could see Seidel, both women had already been shot, and Seidel was at the end of the bar. (Tr. First Trial at 169). Moreover, at the third trial, Dye testified explicitly that he did not know where Seidel was located when the shots were fired.

Q: What's the next thing you remember?

A: The next thing I remember was a loud noise that woke me up, very loud.

Q: When you woke up, what did you do next if you can remember?

A: I sat up on the couch, just sat straight up, my feet on the floor. Just

listened to see if I could hear what it was that woke me up.

Q: Then what happened?

A: I heard another noise. It was a gunshot.

Q: And then do you recall or could you describe for us the state of your wakefulness to put it awkwardly? I mean when you woke up were you wide awake, partly awake, fuzzy, what?

A: I don't—I'm a little fuzzy when I wake up. I can't say. I'm a little fuzzy when I normally wake up so I imagine I was still fuzzy at that point but I couldn't tell you for sure I don't know. When I heard the second noise I thought to myself, oh, shit. That's exactly what I thought. So I think I was coming awake.

Q: What did you do then?

A: I got up off the couch and looked around the club house cause I knew the noise had come from inside the clubhouse.

Q: And did you—were you able to see anything?

A: Yes, I saw Bruce Seidel standing down at the end of the bar with the pistol in his hand and the two bodies laying on the floor . . .

**Q: Do you know where he [Seidel] was when he fired the shots?**

**A: No.**

(J.A. at 1004–1006) (emphasis added).

Consequently, the prosecutor's opening and closing statements misrepresented Dye's testimony. Dye's version of the story did not, as the prosecutor alleged, "essentially say that Mr. Seidel is somewhere on the patron side shooting these two ladies". (J.A. at 632–33). Indeed, Dye denied explicitly as to having any knowledge of Seidel's location when the shots were fired.(J.A. at 1006).

The prosecutor further misrepresented the testimony of the State's expert serologist, Avery. The prosecutor stated during his opening arguments that he utilized the services of the serologist following the second trial in an effort to determine whose "version was right". (J.A. at 633). In his summation, the prosecutor stated that "when we look at the photographs taken at the scene" they "contradict Mr. Dye and show that his version is not and cannot be accurate." (J.A. at 1141). The prosecutor further stated that the "evidence in this case that came from Ms. Collins, brains and blood on the ceiling, proves beyond any doubt that Mr. Dye is the fellow that did that to her." (J.A. at 1142). Avery testified explicitly, however, that he was unable to generate an opinion as to whether his findings corroborated either Dye or Seidel's version of the murders. (B.A. at 1014–1015).

The following exchange occurred during the cross examination Avery:

Q: . . . I guess I misunderstood you too when you testified on direct to suggest that you concluded that the victim would have been seated, for example, at the bar in a certain position. In other words, what you're saying is that you don't have to draw that conclusion from your opinion?

A: I have never given that opinion as far as what position the individual is in, whether she was standing, sitting, her head lying down or not. All I have indicated is that the head would have been in a plane intersecting one of those red lines.

Q: And I suppose it's also true that you really have no opinion whether Mr. Dye's version of the incident is more or less plausible than Mr. Seidel's version as those versions were given to you by Mr. Reynolds, do you?

A: Those versions are irrelevant to my observations. I am not even indicating who could have placed the shot where. (B.A. at 1014–1015).

The forgoing reveals that the prosecutor misrepresented the testimony of Avery in much the same manner as he did that of Dye. Such misrepresentations were explicit in nature as they directly contradicted Avery's actual testimony that his findings verified neither Seidel nor Dye's accounts of the murders. The prosecutor offered these misrepresentations in an attempt to denigrate the credibility of the defendant, (J.A. at 1141) ("you will come to the conclusion that the physical evidence, the objective evidence, the things that don't lie, contradict Mr. Dye and show that his version is not and cannot be accurate"), and to bolster the testimony of the prosecution witnesses.

We acknowledge that while counsel has the freedom at trial to argue reasonable inferences from the evidence, counsel cannot misstate the evidence. *Carter*, 236 F.3d at 784; *Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir.1985). In addition, a prosecutor is clearly authorized to strike hard blows in an earnest and vigorous prosecution" however, he or she "is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). *See, also, Boyle*, 201 F.3d at 717.

We determine that the prosecutor's depictions of Dye and Avery's testimony fall beyond the boundaries of permissible evidentiary inferences. The prosecutor's claim that Dye's version placed Seidel on the patron side of the bar during the shooting directly misrepresented Dye's actual testimony. The prosecutor further misinformed the jury that Dye's version was not supported by the serologist's findings. To the contrary, Avery explicitly stated that his findings neither proved nor

disproved the accounts of Seidel or Dye. (B.A. at 1015). Consequently, the prosecutor presented patently false statements to the jury.

A prosecutor's misrepresentations to the jury warrant habeas relief if the "comments constitute more than simply trial error under state law. The misconduct must be 'so fundamentally unfair as to deny [the defendant] due process.'" *Kincade v. Sparkman*, 175 F.3d 444, 445–446 (6th Cir.1999) (internal citations omitted).

"The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Due process aims to avoid an unfair trial for the accused, not punish society for the misdeeds of the prosecution. *Id.* (internal citations omitted).

This Court has stated that "when addressing claims of prosecutorial misconduct, we first determine whether the challenged statements were indeed improper." *See, Boyle*, 201 F.3d at 717. If the statements are improper, we then determine whether the impropriety was harmless. *See, United States v. Carroll*, 26 F.3d 1380, 1385–87 (6th Cir.1994). In determining whether improper conduct was harmless, we "look to see if the comments were flagrant and warrant reversal." *Boyle*, 201 F.3d at 717. Flagrancy is determined by an examination of four factors: "1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused." *Id.* at 549–50.

As stated, *supra*, it is clear that the prosecutor improperly misrepresented the facts to the jury regarding the testimony of Avery and Dye. (J.A. at 633–635, 1141–1142). Where a prosecutor misstates facts in evidence, particularly those facts bearing on the credibility of the defendant, this Court will deem the remarks improper, if such remarks were flagrant. *See, eg., Washington*, 228 F.3d at 702; *Boyle* 201 F.3d at 714–15, 717–18. Consequently, the remaining issue for our review is whether the prosecutor misrepresented the testimony of Dye and Avery with the requisite flagrancy.

In examining the factors indicative of flagrant prosecutorial misconduct, we first examine whether the misrepresentations committed by the prosecutor were likely to mislead the jury to a conviction. Such is the case at bar.

The prosecutor opened the case with statements emphasizing the alleged conflict between Seidel and Dye's versions of the murders, and indicated that the scientific evidence, particularly the crime scene photographs, would demonstrate which account was accurate. Therefore, even prior to the taking of witness testimony, the prosecutor misstated Dye's prior trial testimony. The prosecutor alleged that Dye's testimony "essentially says that Mr. Seidel is somewhere on the patron side shooting these two ladies". (JA, 632–33). Yet, Dye denied in the prior trials as to having any knowledge of Seidel's location when the shots were fired. (JA, 1006). Moreover, the subsequent witness testimony failed to conform with the prosecutor's opening predictions.

For example, the prosecutor presented Seidel's testimony implicating Dye as the shooter. (J.A. at 632–633). Seidel further testified Dye committed the murders while standing behind the bar. (J.A. at 633). The prosecutor then presented Avery's expert testimony that the photographic evidence demonstrated that the fatal shots were fired from behind the bar. (J.A. at 633). At this point, the testimony developed as the prosecutor has predicted during the opening statement. On cross-examination, however, Avery explicitly refrained from making any opinion as to the authenticity of Seidel or Dye's versions of the murders. (B.A.1014–1015). Similarly, Dye testified that he believed Seidel to have committed the murders, however, he explicitly denied any knowledge of the Seidel's location when the shots were fired. (B.A. at 1015). Therefore, the prosecutor's anticipatory statements regarding a conflict between Dye and Seidel's accounts as to the location of the shooter, as well the statements predicting that the expert testimony would clarify which version was accurate, never arose in the testimony.

Rather than abandon his strategy to discredit Dye's account with expert testimony, the prosecutor elected in his closing statement to misrepresent the testimony of Dye and Avery. The prosecutor stated that the "blood stain" evidence rendered Dye's account "physically impossible" (J.A. at 1141) and that the "blood and brains on the ceiling, proves beyond any doubt that Mr. Dye is the fellow [that committed the murders]" (J.A. at 1141–1142). Such statements failed to accurately reflect, and were in a many instances directly contrary to, the witness testimony. Consequently, these statements had little other effect than to place before the jury the erroneous inference that Dye's exculpatory testimony was contradicted by Avery's expert testimony. As discussed, *infra*, this case was essentially a credibility contest between Seidel and Dye. No factor was of greater importance to this case than evidence tending to verify or discredit either Seidel or Dye's testimony. Accordingly, the

prosecutor's statements were highly likely to mislead the jury into determining that Avery's testimony demonstrated the fallacy of Dye's account. In fact, Avery's testimony did not, as the prosecutor suggested, discredit Dye's version of the murders.

We further acknowledge that the State's case against Dye lacked significant evidentiary strength. There lacked any physical evidence indicating that Dye committed the murders. As noted by both the Michigan Supreme Court and the district court, this case was in essence, a credibility dispute between Dye and Seidel. *People v. Dye*, 453 Mich. 852, 551 N.W.2d 189, 191 (Levin, J. dissenting); *Dye*, 427 N.W.2d at 514 (Archer, J. concurring); *Dye v. Hofbauer*, 1999 U.S. Dist. LEXIS 9120, No. 97–74817 at *3. The importance of the credibility to the State is underscored by the history of this case. The first trial resulted in a hung jury by an eleven to one vote in Dye's favor at the end of the first trial, at which Seidel, Dawson, and Stever all were present and testified. *People v. Dye*, 431 Mich. 58, 61, 427 N.W.2d 501, 503 (1988). Dye was convicted, however, of these murders at the end of his second trial, at which the testimonies of the three prosecution witnesses' were read into the record. *Id.* As Justice Archer observed in his concurring opinion reversing Dye's conviction:

> it is obvious that the first mistrial resulted from the jury's inability to give credence to the testimony of Seidel, Stever, and Dawson. The inability of the jury at the second trial to view the demeanor of these witnesses therefore greatly reduced the validity and reliability of its evaluation of the witnesses' credibility. In fact, over the objection of the defense counsel, the individuals reading the prior testimony in the second trial were allowed to embellish the written words with dramatic effects.

*People v. Dye*, 427 N.W.2d at 516.

The trio again testified at Dye's third trial, and the prosecutor presented the additional expert testimony of Avery. (B.A. at 947–1022). Such testimony ultimately lead to Dye's conviction, however, the testimony was tainted by the prosecutor's improper statements. It is without doubt, therefore, that the State's case against Dye hinged on the credibility of three witnesses present at the time of the murders. Accordingly, the weak nature of the State's case weighs in favor of a finding of flagrancy. *See, Sizemore v. Fletcher*, 921 F.2d 667, 671 (6th Cir.1990) (finding flagrant prosecutorial misconduct where "the proof of guilt in this case does not appear to have been overwhelming. This is evident from the nature of the proofs and from the fact that at Sizemore's first trial the jury was hung eleven to one in favor of acquittal").

With respect to the second and third factors in determining the flagrant nature of the prosecutor's comments, it is undeniable that the misrepresentations were made at frequent intervals and with deliberative intent. The history of the case, a history that the prosecutor was undoubtedly well-aware, indicated that the prosecution's key witness suffered from significant deficiencies with respect to credibility. The prosecutor's theory of the case was based, therefore, upon Dye's version of the murder being invalidated by the serologists's testimony. It is clear that these statements were intended to denigrate Dye's credibility, as well as bolster the credibility of all three of the prosecution's witnesses. Moreover, the prosecutor emphasized this erroneous theory in his opening statement and during his summation. Consequently, the misrepresentation of Dye and Avery's testimony constituted an

integral and continuous strategy implemented by the prosecution. Accordingly, we determine that the primacy of the misrepresentations to the prosecution's case renders proper the finding that the misconduct was flagrant.

We determine, therefore, that the prosecutor's frequent and erroneous misrepresentations of the evidence were designed to mislead the jury and had a high degree of likelihood of achieving this result. These factors, coupled with the overall weak nature of the State's case against Dye, lead this Court to determine that the prosecutor committed flagrant prosecutorial misconduct.

We are mindful that "[a]s the people's representative in our system of justice, a prosecutor must adhere to the rules and principles that ensure that a jury determines a defendant's guilt based on the evidence before it. In a close credibility contest such as this, with horrible acts alleged but scant hard evidence for the jury to weigh, a prosecutor must be doubly careful to stay within the bounds of proper conduct." *Washington*, 228 F.3d at 709.

We conclude, therefore, that in this case the prosecutor's misconduct effected the fairness and integrity of the judicial proceedings. Simply, Dye was denied due process of law as a result of the prosecutor's misrepresentations to the jury. The district court unreasonably applied law to the contrary, thus, the AEDPA compels the issuance of the writ.

Accordingly, for the reasons stated above, we **REVERSE** the district court and grant a conditional writ of habeas corpus, giving the State of Michigan ninety (90) days in which to provide Dye with a new trial or release him.

DAUGHTREY, Circuit Judge, dissenting.

The majority concludes that comments regarding the defendant's testimony, made by the prosecutor in his opening and closing arguments, not only were improper but also were so unfair as to amount to a constitutional violation warranting habeas relief. Because I disagree with the majority on both counts, I must respectfully dissent.

In rejecting the same claim of prosecutorial misconduct upon which the majority now bases its reversal of the district court's judgment, the Michigan Court of Appeals correctly observed that, although a prosecutor cannot make a statement of fact to the jury that is unsupported by the evidence, "he is free to relate the facts adduced at trial to his theory of the case, and to argue the evidence and all reasonable inferences arising from it to the jury." *People v. Dye*, No. 136707, slip op. at 5 (Mi.Ct.App. Nov. 28, 1995). We have made the same observation in evaluating habeas claims of prosecutorial misconduct. *See, e.g., Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir.2000) (noting that prosecutors "must be given leeway to argue reasonable inferences from the evidence"). Upon review of the record, I agree with the conclusion of every court that has reviewed this case that the prosecutor's comments at issue here were the product of fair inferences drawn from the evidence presented at trial and cannot be considered improper.

A brief summary of the proof will bear out this conclusion. The record establishes that, at the time of the shootings, there were four people in the downstairs area of a members-only motorcycle club and two upstairs in the building. The latter two were either sleeping (according to Seidel, the government's witness), or they were watching from a window the smoke resulting from a firebomb they had just detonated (according to defendant

Dye). The two women downstairs at the bar ended up dead, one of them from a gunshot wound to the head that splattered blood and brain matter on the walls and ceiling in such a manner that indicated that her killer was standing *behind* the bar in the main room.

Seidel's testimony was that the defendant, positioned on the service side of the bar, got into an argument with Glenda Collins, who was seated at the customer side of the bar, about whether she would perform fellatio on him. According to Seidel, the argument ended with Dye reaching across the bar, grabbing the back of the Collins's head with his left hand, putting a pistol to her forehead with his right hand, pulling his left hand away, and firing the gun into her head. Then, Seidel testified, in order to eliminate her as a witness, the defendant shot Bartels, the second woman, who was playing pool nearby. In contrast, defendant Dye maintained that he was sleeping on a nearby couch when the first shot was fired, jumped up immediately after the second shot, and saw Seidel standing *in front* of the bar, *between the two victims,* with a gun in his hand.

Given its theory of the case—that defendant Dye was the shooter and not Seidel—the prosecution's job was to discredit Dye's version of the events so that the jury would believe Seidel and find Dye guilty of murder. In order to do so, the prosecution focused on (1) Seidel's testimony that the defendant shot Collins from behind the bar, (2) the defendant's testimony to the contrary that he saw Seidel standing in front of the bar immediately after the second shot, and (3) expert testimony that the shooter had to have been *behind* the bar when the first victim was shot (as Seidel had testified), and not *in front* of the bar (as Dye maintained).

Hence, in concluding that the prosecutor commented unfairly during opening statements and closing arguments on Dye's testimony and on the testimony of the forensic expert, the majority takes an extraordinarily cramped view of both the evidence presented at trial and the axiom that a prosecutor must be given leeway to present his theory of the case by drawing reasonable inferences from the evidence. Moreover, in its characterization of Dye's testimony, the majority sets forth an incomplete excerpt from the transcript in which the defendant stated that he was "fuzzy" when awakened by the gunshots, but that he "saw Bruce Seidel standing down at the end of the bar with the pistol in his hand and the two bodies laying on the floor." As the majority opinion indicates, one page later, defense counsel asked his client, "Do you know where he [Seidel] was when he fired the shots?" to which Dye responded, "No." The majority places great weight on the latter response, concluding that Dye "denied explicitly" any knowledge of Seidel's location when the shots were fired. Yet the majority's discussion omits altogether the intervening question put to Dye, and Dye's unambiguous answer:

Q: Was Mr. Seidel on the serving side of the bar or in front of the bar when you first saw him?

A: He was at the corner *on the customer side of the bar.*

The defendant then added, "Bruce [Seidel] was standing right near this corner here. One body was laying on this side and one body was laying at an angle from the end of the bar this way and Bruce was standing right in the middle looking down at both of them."

Critically important, it became clear upon cross-examination that Dye's story was that he saw Seidel on the customer side of the bar *instantly* after hearing the second shot:

Q: So when you heard that second shot it's fair to say you were up like a rocket?

A: Yes, I stood up fast.

Q: Okay. And at that time you said you saw Mr. Seidel with a gun in his hand, right?

A: Yes.

Q: And the two ladies that were down on the floor in the club; is that correct?

A: Yes.

Dye expressly denied hearing "any noises or scuffling or anything like that" in between the first and second shot that, one might reasonably infer, would result from the shooter scurrying from a position *behind* the bar before the first shot, to a position in *front* of the bar by the time of the second shot.

Two pages later in the transcript, the defendant was forced to acknowledge that at the previous trial he had said that Seidel was standing "toward the end of the bar," not at the very end. But he clarified his response by noting, "I think I was just giving the general areas of where we were at that point."

From the state of this record, it was perfectly fair for the prosecutor to say in his opening statement that, "Mr. Dye's version essentially says that Mr. Seidel is somewhere on the patron side shooting these two ladies." Indeed, that is *essentially* what the trial record says to me.[1] This proceeding marked the third time that the *Dye* case had been tried, and the lawyers were uniformly well-versed as to the testimony of the key witnesses. I think it is especially telling that, following

the prosecutor's opening argument—which is now labeled by the majority as a flagrant misrepresentation of the evidence— Dye's counsel lodged numerous objections, but not one of them went to the prosecutor's characterization of Dye's prior testimony. I an convinced that there was no objection on this basis because there was nothing objectionable about it—as a matter of law or fact.

The prosecutor's argument that the expert testimony of serologist Bob H. Avery proves that Dye was the shooter, which also passed without objection at trial, was equally proper. Far from being a misrepresentation of the expert's testimony, the argument was the product of simple logic. First, Seidel testified that defendant Dye shot Collins from *behind* the bar. Second, taken at face value, Dye's purported version of events supports the inference that Seidel had to have shot the women while standing *in front of* the bar. Third, Avery testified to his conclusion that, based upon the physical evidence at the scene, the shooter was positioned *behind* the bar, not in front of it. A fair deduction from these premises is that Seidel's testimony was true and—concomitantly—that Dye's was false. The prosecutor's argument at closing follows logically from Avery's clear and undisputed testimony. For this reason, and contrary to the majority's suggestion otherwise, I find no significance whatever in the fact that Avery declined defense counsel's invitation on cross-examination to endorse Seidel's version of the shooting over Dye's. The majority fails to recognize a reality that the jury surely did: Avery

---

1. Based upon his indisputably thorough review of the record, the magistrate judge reached the same conclusion:

    Contrary to [Dye's] argument, however, he did in fact testify in the second trial that he stood up immediately upon hearing the second shot, and at that time saw Seidel standing on the patron side of the bar, as evidenced by the prosecutor's attempt to

    impeach [Dye] on this point in the third trial. A fair inference of [Dye's] testimony that he stood up immediately after the second shot and saw Seidel in front of the bar is that, in [Dye's] version of events, Seidel fired the shots from in front of the bar. Thus, ... the prosecutor was simply drawing a permissible inference from the evidence.

took the stand not to vouch for the account of one particular witness over that of another; rather, he was there to explain what conclusions could be drawn about the position of the shooter, based on the physical evidence. This much is demonstrated by Avery's testimony that he "ignored" the information presented to him about each witness's respective account of the shooting and that he "really d[id]n't concern [him]self with the names of either defendant or suspect or witness when doing [his] blood splatter interpretation." Accordingly, Avery was comfortable explaining to the jury his expert conclusion about the shooter's *location*, but he had no interest in identifying the shooter's *name*. As previously noted, it is well-settled that in making its closing argument, "the government should not be restricted to a sterile recitation of uncontroverted facts." *United States v. Rose*, 12 F.3d 1414, 1424 (7th Cir.1994) (internal quotations omitted). In my judgment, then, it was entirely fair for the prosecutor in this case to suggest to the jury the obvious inference to be drawn from the serologist's conclusions, and equally fair for the jury to draw those inferences in finding Dye guilty. Simply put, the prosecutor did nothing wrong.

This, of course, was the conclusion of the Michigan Court of Appeals. In ruling on direct appeal that "[t]he prosecutor did not argue facts not in evidence or create an evidentiary conflict where none existed," the state court summarized the state of the record as follows:

> Avery's testimony regarding the bloodstains on the overhand above the bar and on the ceiling in front of the bar indicated that the shooter stood behind the bar when he shot Glenda Collins.

Defendant's prior testimony stated that he stood up immediately when he heard the second shot and immediately saw Seidel standing on the patron side of the bar next to the bodies. Defendant's testimony indicates that Seidel was standing in front of the bar when he fired the shots, and so conflicts with Avery's expert testimony that the shots were fired from behind the service side of the bar.

*People v. Dye*, No. 136707, slip op. at 5 (Mich.Ct.App. Nov. 28, 1995). In reviewing this decision, we must be mindful of the Supreme Court's admonition that "the appropriate standard of review for ... a claim [of prosecutorial misconduct] on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (internal quotations omitted). In my view, the majority fails to provide an adequate explanation for its apparent determination that the state court's disposition of Dye's prosecutorial misconduct claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "was based on an unreasonable determination of the facts in light of the evidence presented" at trial. *See* 28 U.S.C. § 2254(d)(1)-(2).[2]

Because I conclude that the prosecutor's remarks were not improper, I would affirm the district court on that basis. However, with respect to the majority's conclusion that the remarks were so flagrant as to undermine the fairness of the trial, I disagree with the premise that the case against the defendant was nothing more than a credibility battle between Dye and

---

**2.** The majority here mistakenly frames the issue under AEDPA when it holds that "[t]he district court unreasonably applied law to the contrary, [and] thus AEDPA compels the issuance of the writ." In fact, under 28 U.S.C. § 2254(d), the question is not whether the

*district court's* decision was an unreasonable application of Supreme Court precedent, or was based on an unreasonable determination of the facts in light of the evidence presented at trial, but rather whether the *state* court's decision can be so characterized.

Seidel[3] and that it "lacked significant evidentiary strength." Although it is true that there was little forensic evidence directly pointing to Dye's guilt, the jury heard credible testimony that Dye had confessed to having been involved in the shootings to his friends, the two men sleeping upstairs at the time the murders occurred. Other factors also weigh against the majority's conclusion that Dye was deprived of a fair trial. For one, the trial court expressly instructed the jury, as trial courts typically do, that "[t]he lawyers' statements and arguments are not evidence; they are only meant to help you understand the evidence and each side's legal theories." Jurors are, of course, generally presumed to follow the court's instructions. *See Penry v. Johnson*, 532 U.S. 782, 799, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001). In addition, the defendant does not claim, and there is nothing in the record to suggest, that he was prevented from rebutting any perceived misrepresentations by the prosecutor. Finally, as noted previously, defense counsel did not see fit to make a contemporaneous objection to the statements that the majority now deems "flagrant prosecutorial misconduct."

The Supreme Court has acknowledged that "[t]he line separating acceptable from improper advocacy is not easily drawn; there is often a gray zone." *United States v. Young*, 470 U.S. 1, 7, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). We frequently characterize such cases as "hard" ones. In my view, however, this case is not difficult—indeed, it cannot be said to fall anywhere in the "gray zone." On the basis of the evidence in the record, I am convinced that both the state court and the district court correctly concluded that the prosecutor's comments do not constitute an appropriate basis for granting habeas relief.[4] Accordingly, I would affirm the judgment below.

---

3. According to the majority, "both the Michigan Supreme Court and the district court [held that] this case was in essence [ ] a credibility dispute between Dye and Seidel." This statement appears to be at least 50 percent off the mark, because none of the Michigan cases cited as support for this conclusion represent the opinion of more that a single judge on that court. In the first case cited by the majority, the "credibility dispute" characterization came in the dissent of a single judge. *People v. Dye*, 453 Mich. 852, 551 N.W.2d 189, 191 (Mich.1996) (Levin, J., dissenting). The second citation does not support the proposition for which it is cited, and it also represent the view of only one judge. *See People v. Dye*, 427 N.W.2d at 514 (Archer, J., concurring).

4. Because of its determination that the prosecutorial misconduct claim warrants habeas relief, the majority does not address the remaining issues raised in Dye's petition. In affirming the judgment of the district court, I would find that each of these claims also fails on its merits.